## In re BREWER.

(District Court, E. D. North Carolina. March 15, 1923.)

No. 715.

1. **Executors and administrators** &#x29AB;&#x21DD;291—**Title to legacy vests in legatee only by assent of executor.**

Title to a legacy vests in the legatee only by assent of the executor, or one of the executors, if more than one, which assent may be either express or implied from the acts of the executor, and merely perfects the title, which is acquired under the will.

2. **Executors and administrators** &#x29AB;&#x21DD;291—**Acts of executors held to operate as assent to the vesting of title to legacies in the legatees.**

Acts and conduct of executors *held* to operate as an assent to the vesting of title to the interest of the testator in a mercantile partnership in the legatees to whom it was bequeathed.

3. **Executors and administrators** &#x29AB;&#x21DD;291—**Assent of executors to vesting of legacy cannot be revoked.**

Assent of executors to the vesting of title to a legacy, once given and acted on, cannot be revoked.

---

&#x29AB;&#x21DD;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Executors and administrators ⬅291—Property held to have vested in legatees by assent of executors, and no longer part of estate.**

Testator, who for 20 years had been owner of a half interest in a mercantile partnership managed by his partner, bequeathed one half his interest to such partner and the other half to another. By assent of the executors, the legatees took control of and continued the business. Testator's estate was large, the partnership business was prosperous, and its net assets above liabilities were valued by the executors at $147,000. *Held*, that the action of the executors in assenting to the passing of the legacies was justified, and operated to withdraw the partnership property from the estate; that the business was thereafter conducted, not by the surviving partner as such, but by the legatees as owners.

**5. Partnership ⬅178—Right of creditors to preferred payment from partnership assets is derived from equities of partners.**

The right of partnership creditors to preferred payment from partnership assets is derived from the equities of the partners, each of whom is entitled to have partnership assets applied to partnership debts for which he is liable, rather than to debts of his partner.

**6. Partnership ⬅178—Administration of assets.**

To enforce the preferred right of unsecured partnership creditors in partnership assets, such assets must be within the control of the court through bankruptcy or other proceedings for their administration.

**7. Partnership ⬅183(3)—Partner in solvent firm may transfer his interest to other partner.**

If one of two partners, in good faith and while the firm is solvent, transfers his interest without restriction to the other partner, the partnership property ceases to be such, and becomes the several property of the transferee, in which creditors of the partnership having no lien have no greater rights than his personal creditors.

**8. Partnership ⬅183(3)—Testator, bequeathing his interest in a partnership to his partner, held to have reserved his equity to have the firm property applied to firm debts.**

Where one of two partners on his death bequeathed his interest in the partnership to his partner and another, subject to the payment of any indebtedness to himself, "and subject to all other firm indebtedness outstanding at the time," he retained his equity to have the partnership property applied to firm debts, which inured to partnership creditors on the subsequent bankruptcy of the surviving partner, who had acquired the interest of the other legatee.

**9. Bankruptcy ⬅11—Bankruptcy court may enforce equities of partnership creditors.**

A court of bankruptcy under its equity powers may enforce the equities of partnership creditors in property of a bankrupt in its possession for administration.

**10. Bankruptcy ⬅88(2)—Executors of deceased partner may intervene in bankruptcy proceedings against surviving partner.**

On the bankruptcy of a surviving partner, who has succeeded to the ownership of the partnership property, subject to payment of its debts, the executors of the deceased partner, whose estate is solvent, may intervene to assert his equity to have the partnership assets applied to the partnership debts.

**11. Bankruptcy ⬅312—Executors held not estopped to assert testator's equity as a partner.**

One of two partners on his death bequeathed his interest in the business to his partner and another, subject to the firm indebtedness. His estate was amply solvent, and the business was solvent and prosperous. His will was probated and of record. With the assent of the executors, the legatees took possession of the business and continued it, notice of which was given by publication. Shortly afterward the surviving partner bought

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

out the other legatee and continued the business alone, notice of which was also published. He subsequently became bankrupt. *Held* that, in the absence of any act by the executors which induced creditors to extend credit to bankrupt in the belief that the property of the original partnership was not liable for its debts, the fact that they took no action to subject it to such liability did not estop them from asserting the testator's equitable right to have it so applied in the bankruptcy proceedings.

12. Bankruptcy ⟨⟩354—Court may marshal assets as between personal and partnership creditors.

Under Bankruptcy Act, §§ 5f, 5g (Comp. St. § 9589), a court of bankruptcy may marshal assets between personal and partnership creditors.

13. Partnership ⟨⟩183(3)—Mortgage to part owner subject to partnership debts.

Where a legatee of an interest in a partnership subject to the firm indebtedness · sold his interest to the owner of the remaining interest, taking a mortgage on partnership property for the purchase price, such mortgage is subject to his testator's equity to have the firm debts first paid from the property.

14. Partnership ⟨⟩247—Note given after death of partner held subject to partnership debts.

A note of a partnership to a bank, executed by one partner after dissolution by death of his copartner, which fact was known to the bank, *held* subject to payment of debts contracted prior to the dissolution from the partnership property.

15. Novation ⟨⟩5—Renewal of partnership notes after death of partner held not "novation."

The execution of notes in the name of a partnership by a surviving partner, who had succeeded to the ownership of the firm business, in renewal of notes given during the lifetime of his partner, *held* not to constitute a "novation," and such notes *held* entitled to share in partnership assets.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Novation.]

16. Partnership ⟨⟩68(2)—Real estate of partnership treated as personalty in administration of estate.

Real estate bought with partnership funds for partnership purposes is to be considered as partnership property, and like personalty subject to all the equitable rights of the partners as between themselves.

In Bankruptcy. In the matter of H. E. Brewer, bankrupt. On review of order of referee fixing classification of claims and priority of debts.

Kemp D. Battle, F. E. ·Winslow, and L. V. Bassett, all of Rocky Mount, N. C., for executors of R. H. Ricks.

W. A. Lucas, of Wilson, N. C., for trustee.

M. V. Barnhill, of Rocky Mount, N. C., and H. G. Connor, Jr., of Wilson, N. C., for Southern Cotton Oil Co.

Hugh W. Davis, of Norfolk, Va., for Norfolk Nat. Bank.

Thorne & Thorne, of Rocky Mount, N. C., for Wilson W. Ricks.

F. S. Spruill, of Rocky Mount, N. C., for F. S. Royster Guano Co.

CONNOR, District Judge. This cause comes on for hearing upon the findings of fact and conclusions of law made by the referee, classifying the debts proven against the estate of H. E. Brewer, bankrupt, and the petition of R. L. Huffines, trustee, and the several peti-

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tions for review, filed by creditors of H. E. Brewer. The referee, in his certificate, finds and reports the following facts:

During the year 1900, H. E. Brewer and R. H. Ricks, both of Rocky Mount, N. C., formed a partnership for the purpose of conducting a general mercantile business under the name and style of H. E. Brewer & Co. Each partner contributed, on account of the capital of the firm, $2,500. Brewer was to be, and was in fact, the active manager of the business; Ricks taking no part therein. His name appeared on the stationery of the firm. The capital was increased during the year 1914, each partner at that time contributing $7,500 additional, to cover some building operations on the property of the firm used for the partnership business.

On February 20, 1920, R. H. Ricks died, leaving a last will and testament, duly admitted to probate in the superior court of Nash county. He bequeathed to H. E. Brewer one-half of his one-half interest in the property, good will, etc., of the partnership, and to his nephew, W. W. Ricks, the remaining one-half, "subject to the payment of the debts of the said partnership." He left, as his executors, Thomas H. Battle, H. E. Brewer, and several others. The executors named in the will duly qualified and entered upon the discharge of the duties and trusts imposed upon them. H. E. Brewer acted in concert with the other executors. The estate of Ricks was of large value and is amply solvent.

(1) No new inventory or statement of the condition of the partnership business was made after the death of Ricks, but Brewer exhibited to the executors the inventory taken January 1, 1920, with financial statement of same date. The inventory was accepted by the executors, showing the financial condition of the partnership at the date upon which it was taken. This statement showed, and it was true, that on February 19, 1920, the partnership was amply solvent, so considered by H. E. Brewer and the other executors of Ricks. The business conditions in Eastern North Carolina, at that time, were very prosperous.

(2) After the death of Ricks the business of H. E. Brewer & Co. was continued and operated in the same way and place as before his death. No change whatever was made in the name or manner of conducting the business after, or by reason of, the death of Ricks. Orders were taken; goods and merchandise bought and sold on credit and for cash. No change was made in bookkeeping. Negotiable paper was made, and notes executed prior to the death of Ricks were renewed, in the firm name. This was done by H. E. Brewer, or under his immediate direction.

The business of the partnership was conducted by Brewer, after the death of Ricks, with no idea or purpose of liquidation, but for the purpose of profit. On February 19, 1920, a large number of the customers of the firm had not paid in full their accounts contracted during the year 1919, amounting to approximately $90,000. By carrying on the business another year and furnishing them—customers, farmers in the surrounding section—there may have been a better chance of collecting these 1919 accounts. There was no necessity for

continuing the business during the year 1920, in order to save the assets of the partnership.

Prior to the death of Ricks, the partnership had entered into certain contracts with various farmers and others, about 75 in number, to sell and furnish them goods, merchandise, food, and feedstuffs, supplies, and fertilizers, during the year 1920. The partnership, prior to February 19, 1920, had purchased goods and merchandise which had not been delivered at said date. The stock of merchandise on hand and purchased, but not delivered, was not sufficient to supply the persons whom it had contracted to furnish during the year 1920.

The course pursued by H. E. Brewer, after the death of Ricks, as found and stated by the referee, was with the knowledge of the other executors of R. H. Ricks, and without any protest or dissent on their part, until the early part of 1921. Brewer was not required, nor did he give any bond, as surviving partner, as provided by the North Carolina statutes. Consol. Statutes, § 3277.

With the knowledge and consent of the executors of R. H. Ricks on March 6–22, 1920, a notice of the dissolution of the partnership of H. E. Brewer & Co. and notice to creditors to file their claims with the surviving partner was published by H. E. Brewer in the Telegram, a daily paper published at Rocky Mount, N. C. Said notice also contained the statement that the business would be conducted as theretofore, under the same name, by H. E. Brewer and W. W. Ricks as copartners. No specific notice was mailed to each creditor. Many of the larger creditors, Norfolk National Bank, Southern Cotton Oil Company, and F. S. Royster Guano Company, had actual notice of the death of R. H. Ricks.

On May 28, 1920, H. E. Brewer bought the interest of Wilson W. Ricks in the partnership assets, and notice of such purchase was published, and thereafter Brewer conducted the business under the same name and in exactly the same manner as formerly. No specific notice of this change was sent to creditors, and there is no evidence that creditors generally had knowledge of such change.

During the late fall of 1920, and early spring of 1921, H. E. Brewer began to experience financial difficulties, and on February 16, 1921, by his consent, but through the initiation of the other executors of R. H. Ricks, L. B. Aycock, his former bookkeeper, was appointed collector of the assets of the partnership by an order of the superior court of Nash county, N. C. On said date, H. E. Brewer & Co. as a partnership and H. E. Brewer individually were insolvent. On April 23, 1921, an involuntary petition in bankruptcy was filed against H. E. Brewer, and after a hearing upon said petition he was on September 7, 1921, adjudged a bankrupt and the cause referred to Joseph B. Cheshire, Jr., referee.

The property of H. E. Brewer, at the date of his adjudication, consisted of real estate purchased and paid for by the partnership and conveyed to the partners, trading as H. E. Brewer & Co. This property was owned by the partnership prior to, and at the death of, Ricks (a list of which is made by the referee). This property was sold by the trustee for approximately $106,000. The stock of goods and mer-

chandise, consisting of stock on hand at the time of the death of Ricks, was sold by the trustee for approximately $13,000. The amount in the hands of L. B. Aycock, collector, consisting of the proceeds of goods sold and collections made prior to the adjudication, approximated $20,000. The trustee has collected from book accounts, bills receivable, etc., approximately $35,000. The stock of goods consisted of goods, etc., on hand at the date of the death of Ricks, which had not been sold prior to the bankruptcy, and the goods purchased by Brewer subsequent to the death of Ricks. It is impracticable to ascertain what portion of the stock represents either of the classes.

The total indebtedness of H. E. Brewer & Co. and H. E. Brewer, at the date of the adjudication, is approximately $500,000, a large portion of which was contracted by the partnership prior to February, 1920. The proceeds of the sale of the property owned by the partnership and collections made from the accounts and notes, which vested in H. E. Brewer and Wilson W. Ricks as legatees of R. H. Ricks, will not be sufficient to pay the indebtedness outstanding against the partnership on February 20, 1920.

For the purpose of distribution of the assets derived from the sales of the property, and collections made from the notes and accounts belonging to the partnership on February 20, 1920, the referee made the following classification of the indebtedness, as shown by proof of claims:

(1) Debts contacted by the partnership prior to February 20, 1920, including debts represented by notes signed by H. E. Brewer, in name of H. E. Brewer & Co., for renewal of notes executed by the partnership prior to February 20, 1920.

(2) The debts of the Southern Cotton Oil Company.

(3) Debts contracted by H. E. Brewer after February 20, 1920.

A list of the indebtedness, showing date upon which each debt was contracted and renewal notes executed, was filed by the referee. The purpose of the classification was to direct the trustee of the order in which the proceeds of the partnership property should be applied in payment of the indebtedness of H. E. Brewer & Co., prior to the death of R. H. Ricks, and of H. E. Brewer subsequent thereto. To this classification R. L. Huffines, trustee of the Norfolk National Bank, the Southern Cotton Oil Company, and Wilson W. Ricks, filed petitions for review, and, pursuant thereto, the referee certified his findings of fact and conclusions of law to the judge.

The foregoing findings of fact are applicable to the debts of all of the creditors. Specific findings of fact, which will be dealt with later, were made as to the debts of the Southern Cotton Oil Company, Wilson W. Ricks, and the renewal of notes of the partnership. The petitions were argued before me and the contentions of the trustee, the creditors of H. E. Brewer, and the executors of R. H. Ricks clearly set forth in the oral arguments and briefs.

Petitioners for review concur in making the contention that, by the death of Ricks and the probate of his will, and course pursued by the executors, the title of R. H. Ricks in the partnership assets vested in H. E. Brewer and Wilson W. Ricks, free from any lien or

trust for the partnership creditors or the executors of R. H. Ricks; that by the purchase by Brewer of the one-fourth interest of Wilson W. Ricks the title to the entire property vested in H. E. Brewer, free from any lien or trust; and that by his adjudication as a bankrupt, and the election of the trustee, his title vested in his trustee, to be applied to the payment of his debts pro rata.

The executors of R. H. Ricks contend: (1) That upon the death of Ricks the title to the partnership property vested in H. E. Brewer, as surviving partner, with the powers and duties incident thereto. (2) That the legatees, H. E. Brewer and Wilson W. Ricks, took the legacies under the will, with a trust imposed for the payment of the debts of the partnership, and they are entitled to have this trust executed by the trustee of H. E. Brewer in this proceeding.

The petitioners for review contend: That, upon the death of Ricks and the probate of his will, followed by the qualification of the executors and the course pursued by them in regard to the partnership property, the executors assented to the legacy, vesting in Brewer and Wilson W. Ricks the complete legal title and actual possession of the partnership property. That the executors had no further interest in, or control over, the property. That the creditors of the partnership had no lien upon, or right to subject, the partnership property to the payment of their debts. That the estate of R. H. Ricks continued to be liable for the payment of the debts as it was prior to his death.

It is elementary law that by the death of R. H. Ricks the partnership was dissolved, and, unless the bequest of his interest in the partnership property operated to vest the title of Ricks' interest in Brewer and W. W. Ricks, as legatees, Brewer took and held the title as surviving partner. Bank v. Hollingsworth, 135 N. C. 556, 47 S. E. 618, and authorities cited.

"It is common learning that the death of a partner, in the absence of any stipulation in the articles of copartnership to the contrary, works an immediate dissolution; that the title to the assets vests in the surviving partner, impressed with a trust to close up the partnership business, pay the debts, and turn over to his personal representative the share of the deceased partner." Walker v. Miller, 139 N. C. 448, 52 S. E. 125, 1 L. R. A. (N. S.) 157, 111 Am. St. Rep. 805, 4 Ann. Cas. 601; Consol. Stat. N. C. § 1735.

So it is provided by the statute (Consol. Stat. N. C. § 3277) that, upon the death of any member of the partnership, the surviving partner shall, within 30 days, execute before the clerk of the superior court of the county, where the partnership business was conducted, a bond payable to the state of North Carolina, with sufficient surety, conditioned for the faithful performance of his duties in the settlement of the partnership affairs, etc. And, upon failure of the surviving partner to execute the bond so provided for, the clerk shall, upon the application of any person interested in the estate of the deceased partner, appoint a collector, who shall be governed by the same law governing administrators, etc. Section 3278. The surviving partner, together with the personal representative of the deceased partner, shall, within 60 days after the death of the deceased partner, make

out a full and complete inventory of the assets of the partnership, including real estate, if there be any, together with a schedule of the debts and liabilities thereof, a copy of which shall be retained by the surviving partner, and a copy furnished the personal representative of the deceased partner. Section 3279. Upon failure of the surviving partner to make the inventory, as provided, the representative of the deceased partner may have the inventory made, and if he refuse to permit such inventory to be taken, the personal representative may apply to the court for the appointment of a receiver, etc. Consol. Stat. § 3280. Provision is made by section 3284, by which the surviving partner may purchase the interest of his deceased partner.

[1] It is essential, in fixing the rights of the creditors of the partnership and of the executors of R. H. Ricks, to ascertain whether the executors assented to the legacy given by Ricks of his interest in the property to H. E. Brewer and Wilson W. Ricks. Whether H. E. Brewer, after the death of Ricks and the qualification of the executors was dealing with the property as legatee, or as surviving partner, depends upon whether the executors assented to the legacy.

"Since it was a rule of the common law that the title to all personal property of the decedent was in the executor or administrator, it early became established that the assent of the personal representative was essential to the passing of the complete title of a specific legacy to one named in the will as devisee [or legatee]. * * * Until then, the legatee has only an inchoate right in the surplus after payment of debts, which is only a right of action, the property remaining in the representative. If a legatee, without the assent of the executor, takes possession of a thing bequeathed, the executor may maintain an action of trespass or trover against him. Upon the assent of the executor to the legacy, the title passes to the legatee; but the assent creates no title. It merely perfects the title acquired under the will." 11 R. C. L. 243 (274); Roper on Legacies, 565; Iredell on Ex'rs, 247.

"The law, for this purpose, has prescribed no specific form, and it may be either express or implied. The executor may not only in direct terms authorize the legatee to take possession of his legacy, but his concurrence may be inferred, either from indirect expression or particular acts, and such constructive permission shall be equally available." Iredell, Executors 250; 1 Roper, Legacies, 568.

In Merritt v. Windley, 14 N. C. 399, the court approved an instruction to the jury on an issue as to whether the executor had assented to a specific legacy:

· "That the executor must manifest an intent to part with the legal title in favor of the legatee. This intent might be manifest either by words or acts. That slight circumstances were, in some cases, sufficient for that purpose."

In Redmond v. Coffin, 17 N. C. 438, 444, Ruffin, J., said:

"After the trust estate is conveyed to the cestui que trust, or the legacy assented to and the property delivered to the legatee, there is no further privity" between the executor and the legatee. "The legal estate is in the legatee himself. A suit then against the executor, founded on his acts or breach of trust, does not affect the legatee, who claims above it, and by a legal title prior to the institution of the suit."

In Cheshire v. Cheshire, 19 N. C. 255, Gaston, J., said:

"Whether the executor did, or did not, assent to the legacy in this case, was a question of fact. The evidence given was pertinent and relevant to the establishment of the fact. * * * The law, indeed, has prescribed no spe-

cific form in which the assent must be given, and the assent may be legitimately implied as well as * * * proved. It is but reasonable, however, that the acts or expressions relied on as indicative of assent should be unambiguous. * * * It was for the jury to say whether they [the facts relied on] proved such assent in fact."

Rea v. Rhodes, 40 N. C. 148, was a suit in equity, in which Ruffin, C. J., discussed the evidence and found the facts, saying:

"Upon the question of assent we think there is no doubt, either in point of fact or law, that there was one. It is not necessary that it should be expressly given or directly proved; for it may be implied from the acts of the parties, or the declarations of the executor, though not amounting simply to an assent. But the acts or declarations, in order to have that effect, must be such as are unequivocal, and satisfy the mind that the executor meant to acknowledge the right of the legatee to the thing, and of course to determine his own title or control over it, in opposition to the legatee. When the executor delivered the legacy to the donee, as his, the act is unequivocal."

In that case:

"The executor denied positively that he had either announced or given an assent to the legacy to his mother or himself."

The Chief Justice said:

"We think, however, notwithstanding the positive denial of the assent, in terms, that the answer itself shows very strongly that it had been given, for the denial may be only of what that defendant deemed an assent, which is matter of law to a considerable extent, and about which he may be mistaken."

The Chief Justice proceeds to discuss the facts established by the answer and evidence, concluding that they established proof of an assent to the legacy. Crist v. Crist, 1 Ind. 570, 50 Am. Dec. 481, and note.

Before proceeding to discuss the course pursued by the executors in regard to the legacy given to H. E. Brewer and Wilson W. Ricks, it will be well to note the relation which Brewer bore to the property as one of the executors of Ricks.

"If several executors are appointed, the assent of any one is sufficient, and therefore, if there be a legacy to one of several executors, he may take it of his own assent, without the others." Iredell, Executors, 253.

In Hearne v. Kevan, 37 N. C. 34, Daniel, J., says:

"It appears that Edward Hall, by his will, gave one undivided fifth part of the slaves * * * to Michael Hearne, until his daughter Mary should arrive at the age of 21 years, and then to the said Mary. The plaintiff, Michael Hearne, insists that he holds these negroes as executor, and we are disposed to believe that he never made an express assent to the legacy. But the law does not require an express assent; it may be implied from particular acts. And if an assent be to the particular tenant of a chattel, it will inure to the benefit of the remainderman, for the particular estate and the remainder constitutes but one estate. * * * The executor's assent to his own legacy may, as well as his assent to that of another legatee, be either express or implied. It may be implied from his conduct, as if an executor, in the manner of administering the property, does any act which shows he has assented to the legacy, that shall be taken as evidence of his assent; but if his acts are referable to his character as executor, they are not evidence of his assent to the legacy."

In the light of these well-settled principles and illustrative decisions, what conclusion should be drawn from the facts appearing in the record and the findings of the referee? In making these findings of fact the referee refers to the pages of the evidence taken by him and transmitted to the court.

It appears that the personal relations between R. H. Ricks and H. E. Brewer, and between Mr. Battle and Ricks and Brewer, were, prior to Ricks' death, very intimate. Brewer was named and qualified as one of the executors and trustees of Ricks' will, together with Mr. Battle, who says that their "relations were very close indeed, both in business and friendship," and that R. H. Ricks "was a close friend of both"—all three close mutual friends." R. H. Ricks left a very large estate, estimated in excess of $1,000,000, without children, and made a number of charitable and other bequests—established trusts for their administration.

Mr. Battle, as chairman of the committee appointed by the executors, a few days after Ricks' death, went to Brewer's store and asked him if it was necessary for him to take an inventory. Brewer said he did not think it necessary; that it would involve a great deal of trouble; that he had taken an inventory January 1, 1920, which was only six weeks before that date. He showed Mr. Battle the inventory, who also read the statement made by Brewer for the bank, of which Mr. Battle was president, and they "figured out how he stood, according to that statement." Mr. Battle says:

"I was inquiring of that, to see about whether or not his taking over the debts of the firm would be properly protected, and whether his bank connections would be desirable under the new arrangements. We made a calculation then—I remember very distinctly what it was—that the firm was worth as shown by the statement of January 1, 1920. He produced and filed the statement, showing that the interest of the two partners was $147,000 net amount over debts. Mr. Brewer said that individually his interest in the firm was worth $50,000, his home $30,000, and he had $20,000 of personalty, making his own worth $210,000. On this statement we decided that it was not necessary to make a new inventory."

The executors, in the light of this testimony, did not require Brewer to file the bond provided for by sections 3277 and 3278 of the Consolidated Statutes. The referee finds that the business was continued by Brewer in the same way as before Ricks' death, with no idea of liquidation, but for the purpose of profit, with the knowledge of the executors, and without dissent from them. On March 6, 1920, notice was published, with the knowledge and consent of the executors, of the dissolution of the firm by the death of R. H. Ricks, and to creditors to file notice of their claims with the surviving partner—that the business would be conducted "as theretofore under the same name, by H. E. Brewer and W. W. Ricks." This notice was not necessary for the protection of Ricks' estate. The legal effect of the notice was that H. E. Brewer and W. W. Ricks had formed a new partnership upon the basis of their being owners of the partnership property, as legatees of R. H. Ricks. The bequest to Wilson W. Ricks did not make him a partner of H. E. Brewer; he could become such only by making a new contract of copartnership with H. E. Brewer. It

is true that the creditors of the partnership were notified to file their claims with H. E. Brewer, "surviving partner." This was on March 6, 1920.

It is difficult to perceive how H. E. Brewer and Wilson W. Ricks could, consistently with the theory that the former was in control of the partnership property as surviving partner of H. E. Brewer & Co., form a new partnership with the knowledge and assent of the other executors, contributing as the capital stock the partnership property. Is it not manifest and entirely consistent with their duty, and without any dereliction thereof to the estate of R. H. Ricks, that, following the careful examination by Mr. Battle, the chairman of the committee, and ascertaining that not only did the partnership have assets amounting to $147,000 in excess of liabilities, but that Brewer was amply solvent, the executors assented to the legacies to Brewer and Wilson W. Ricks? Brewer had no idea of closing up the business, but made a contract of partnership with Wilson W. Ricks, for the purpose of carrying on the business and making a profit. This is consistent with the fact that a business in which he and his former partner had each invested $2,500 in 1900 and $7,500 in 1914 had yielded a net profit of more than $125,000. We may take notice of the fact, known of all men, that the year 1919 had been one of unprecedented prosperity, especially in the section of North Carolina contributing to the success of the business of H. E. Brewer & Co. The referee finds that:

"There was no necessity for carrying on the business to save its assets. * * * February, 1920, was as favorable a time as perhaps any in the life of the business to wind it up. That the business was solvent, and was so considered by H. E. Brewer, the executors, and the public generally."

It appears from Mr. Battle's testimony that he expected Brewer to secure loans from the bank under the "new arrangement." This could not refer to his winding up the business as surviving partner. It is manifest that H. E. Brewer assented to his own and the legacy to W. W. Ricks. His conduct at that time, and for nearly a year subsequent, is inconsistent with the suggestion that he was conducting the business as surviving partner. That he regarded the partnership as amply solvent, with a surplus of at least $120,000, on May 28, 1920, is shown by his purchase of the one-fourth interest of Wilson W. Ricks for $30,000, executing as security for the payment of the purchase money a mortgage on the entire property. The course pursued by the executors is consistent with the provisions in the will of R. H. Ricks, giving his interest in the business to Brewer and Wilson W. Ricks, "but, however, not including any indebtedness which may be due me by said firm at the time of my death, and subject to all other firm indebtedness, outstanding at that time."

It was evidently in the light of this language that Mr. Battle says that he was "inquiring into the condition of the firm, * * * to see whether or not his taking over the debts of the firm would be properly protected, and whether his bank connections would be desirable under the new arrangement." He knew, of course, that the estate of Ricks was liable for the old firm debts, and that Brewer and W. W. Ricks were to discharge them. He was evidently referring to Brewer's

relation to the property as legatee, "taking over" under the terms of the will "the debts of the firm and carrying on the business under the new arrangement," and to the partnership in contemplation to be formed by H. E. Brewer and W. W. Ricks, who, under the terms of the will, were the owners of the partnership property, "subject to the payment of the debts then outstanding."

[2] The course pursued by Mr. Battle and Mr. Brewer, either of whom had the power to assent, without consulting their coexecutors, operated as an assent to the legacies. Thereafter there was no privity of estate or title between the executors and the legatees. The assent of the executors vested no new title in the legatees, but simply perfected their title under the will. Their title was derived from R. H. Ricks, by virtue of his will, and related to the time of his death. Redmond v. Coffin, supra.

[3] Their assent could not be recalled or revoked by any act of the executors. Iredell on Executors, 295. The executors, with full knowledge of existing conditions regarding the partnership property, and the purchase May 28, 1920, by Brewer of W. W. Ricks' interest, and the manner in which the business was conducted, new goods purchased and mingled with the stock on hand at the date of R. H. Ricks' death, and sold in the course of business, took no further notice nor control over the property, nor made any objection to H. E. Brewer's manner of dealing with it, until February 16, 1921, when they instituted the proceeding in the superior court of Nash for the appointment of a collector.

[4] This proceeding, and the appointment of L. B. Aycock as collector, could not divest the title of H. E. Brewer. He was not, and had not been, in possession of the property as surviving partner. The statute (Con. St. § 3278), after the assent of the executors, conferred no jurisdiction upon the clerk to appoint a collector. For the purpose of fixing the status of Brewer, and his creditors in relation to the property, further consideration of this proceeding may be laid aside. The creditors of H. E. Brewer & Co., whose debts were contracted prior to the death of R. H. Ricks, took no action, nor invoked the jurisdiction of the court in respect to their debts or the partnership property.

The course pursued by the executors in regard to the property is consistent with their duties and the rights of legatees. The condition of the partnership affairs—its large surplus, its prosperous condition and prospects, the fact that H. E. Brewer had been the active partner and manager of the business, his large success in doing so, his individual solvency, ownership of three-fourths of the property under the will, the personal relations existing between R. H. Ricks and Brewer, his appointment as one of his executors and trustees—clearly indicated that Ricks intended and expected that Brewer and W. W. Ricks would continue to carry on the business as partners and as owners by virtue of their legacies. These facts and conditions were well known to the other executors, one of whom, A. P. Thorp, was a partner with Ricks in a large tobacco business and a legatee of Ricks' interest, under the same provisions as were expressed in the legacies to Brewer and W. W. Ricks.

Under these conditions, the executors were fully justified in assenting to the legacies. The financial troubles which overtook and bankrupted Brewer resulted from conditions which could not be and were not anticipated by business men of the soundest judgment and largest experience. The unexpected and unprecedented fall in prices of the agricultural products of the state, cotton and tobacco, and other conditions causing the "slump" in values of property, were as unexpected as they were disastrous to the people.

The executors are known by the court and conceded by all persons in interest to be men of large and long business experience, in banking, manufacturing, agriculture, etc., and familiar with conditions in Eastern North Carolina—men of sound judgment and large success. The conditions disclosed by the record are similar to, and illustrative of, the difficulties and perplexities with which the courts are called upon to deal. This conclusion eliminates a number of the questions argued by counsel upon the theory that H. E. Brewer was, between the death of R. H. Ricks and his adjudication in bankruptcy, in possession of and dealing with the property, which was owned by the partnership at the time and date of Ricks' death, as surviving partner.

[5, 6] The question next in order is: What effect did the bequest of R. H. Ricks of his interest in the partnership have upon the rights of the partnership creditors? A statement of some of the well-settled principles in respect to the rights of partnership creditors will aid in the solution of this question.

In Case v. Beauregard, 99 U. S. 119, 25 L. Ed. 370, Mr. Justice Strong says:

"The effects of a partnership belong to it so long as it continues in existence, and not to the individuals who compose it. The right of each partner extends only to a share of what may remain after payment of the debts of the firm and the settlement of its accounts. Growing out of this right, or rather included in it, is the right to have the partnership property applied to the payment of the partnership debts in preference to those of any individual partner. There is an equity the partners have as between themselves, and in certain circumstances it inures to the benefit of the creditors of the firm. The latter are said to have a privilege or preference, sometimes loosely denominated a lien, to have the debts due to them paid out of the assets of the firm in course of liquidation, to the exclusion of the creditors of its several members. Their equity, however, is a derivative one. It is not held or enforceable in their own right. It is practically a subrogation to the equity of the individual partner, to be made effective only through him. Hence, if he is not in a condition to enforce it, the creditors of the firm cannot be. * * * It is indispensable, however, to such relief, when the creditors are, as in the present case, simple contract creditors, that the partnership property should be within the control of the court and in the course of administration brought there by the bankruptcy of the firm, or by an assignment, or by the creation of a trust in some mode. This is because neither the partners nor the joint creditors have any specific lien, nor is there any trust that can be enforced until the property has passed in custodia legis."

[7] So if, before the interposition of the court is asked, the property has ceased to belong to the partnership, if by a bona fide transfer it has become the several property either of one partner or of a third person, the equities of the partners are extinguished, and consequently the derivative equities of the creditors are at an end. It is therefore

always essential to any preferential rights of the creditors that there shall be property owned by the partnership when the claim for preference is sought to be enforced. In Fitzpatrick v. Flannagan, 106 U. S. 648, 1 Sup. Ct. 369, 27 L. Ed. c. 211, Mr. Justice Matthews, approving the decision in the Beauregard Case, quoting from the opinion, proceeds to say:

"Unless a partnership creditor, or the personal representatives of the deceased partner, commence such a proceeding to liquidate the affairs of the partnership, there is nothing to prevent the surviving partner from dealing with the partnership property as his own, and, acting in good faith, to make valid disposition of it. * * * And if, in like good faith, with the acquiescence of the personal representatives of the deceased partner, he uses the firm property to continue the business on his own account and in his own name, he does it without other liability than to be held accountable to the estate of his deceased partner for a share of the profits. * * * Any intermediate disposition of the property, made in good faith, even although it may have been specifically a part of the partnership assets, and even if it has been applied to the payment of his individual obligations, will be valid and effectual" in the absence of fraud.

In Ex parte Ruffin, 6 Ves. Jr. 119, 31 Eng. Rep. 970 (Reprint), 11 Chancery Book, Thomas Cooper and James Cooper were partners. The partnership was dissolved, Thomas assigning his interest to James, at a valuation fixed upon the property. James covenanted to pay the partnership debts then due, and to indemnify Thomas against them executed a bond to secure the performance of the covenant, with surety. The partnership creditors knew of the dissolution and assignment of the property to James by Thomas Cooper; advertisement of the dissolution was made. About two years after the dissolution a commission in bankruptcy issued against James Cooper. Thomas Cooper was solvent. The joint or partnership creditors attempted to prove their debts. Lord Chancellor Eldon remarked that, unless the case was controlled by Ex parte Burnaby, it was "new in its circumstances." He said:

"It is the case of two partners who owed several joint debts and had joint effects. Under these circumstances their creditors, who had a demand upon them in respect to those debts, had clearly no lien whatever upon the partnership effects. They had power of suing, and by process creating a demand that would directly attach upon the partnership effects. But they had no lien upon or interest in them in point of law or equity. If any creditor had brought an action, the action would be joint; the execution might be either joint or several."

The separate creditors of each partner, by bringing actions, might acquire a lien on and sell the partnership property. The Lord Chancellor notes the fact that the assignment by Thomas Cooper of his interest "was not made subject to the payment of the partnership debts." A bond of indemnity was given by James Cooper. The partnership creditors were not permitted to prove their debts and have them paid out of the partnership property.

The Supreme Court of this state has uniformly held that, while the interest of one of the partners in partnership property may be levied upon and sold under an execution issued upon a judgment against such partner, the purchaser under such sale can only claim a share

of the surplus after the payment of the partnership debts. Tredwell v. Rascoe, 14 N. C. 50; Latham v. Simmons, 48 N. C. 28; Ross v. Henderson, 77 N. C. 170. The authorities relied upon by the petitioners for review sustain their contention that if Ricks, without any fraudulent intention, had during his life assigned his interest in the partnershp to Brewer, retaining no lien, nor imposing any trust upon the property to secure or indemnify himself against the payment of the partnership debts, he would, in the event of the subsequent insolvency of the partner to whom he had assigned his interest, not have any equity to have the partnership property applied to the partnership debts, and that therefore the partnership creditors would have no such equity. Brewer, taking Ricks' interest as legatee, was in the same position in respect to the partnership property as if Ricks had made a voluntary assignment of his interest to him. There can be no suggestion of any intention on the part of Ricks to defraud the partnership creditors, because both the partnership and himself individually were amply solvent. He had a right, under existing conditions, to make a gift of his interest, retaining as he did property abundantly sufficient to pay the partnership debts for which he remained liable. Sargeant v. Blake, 160 Fed. 57, 87 C. C. A. 213, 17 L. R. A. (N. S.) 1040, 15 Ann. Cas. 58; Rapple v. Dalton (C. C..A. 9th Cir.) 226 Fed. 430, 141 C. C. A. 260; In re Zartman (D. C.) 242 Fed. 595; Dalton v. Humphreys, 242 Fed. 777, 155 C. C. A. 365; In re Fackelman (D. C.) 248 Fed. 565.

Stringer v. Stevenson (C. C. A. 2d Cir.) 240 Fed. 892, 153 C. C. A. 578 is an illustrative case. Rogers, Circuit Judge, says:

"Partners may by agreement make any disposition of the firm assets that an individual can make of his property. * * * This is, of course, subject to the principle that the transfer is not made to defraud creditors. * * * Whether the principle is also subject to the condition that the firm must have been solvent at the time is a question upon which the courts have differed. We do not need to consider that phrase of the subject, for it is not claimed that the firm of Jewell & Stringer was insolvent when its assets were transferred to Stringer. By the agreement between Jewell and Stringer, upon the dissolution of that firm, the firm assets became the individual property of Stringer, Sr. When the assets are transferred to one partner in consideration of his promise to pay the liabilities, the validity of the transaction turns upon the law of fraudulent conveyances. If no intent to hinder, delay or defraud creditors appears, the firm creditors can not impeach the transaction. The priority of firm creditors depends upon the existence of the partner's lien, and if a partner consents that the firm assets shall become the individual property of one of the partners, the priority of the firm creditors is gone"—citing Case v. Beauregard, supra.

The courts of this state have announced and enforced these principles in regard to the rights of partnership creditors. In Allen v. Grissom, 90 N. C. 90, Smith, C. J., reviews the decisions and approves the decisions in harmony with the English cases.

It seems, from the foregoing decided cases, that if the retiring partner assigns his interest in the partnership assets, making no reservation of title or impressing upon the property no trust for his protection, but accepting the personal covenant of the assignee partner to pay the partnership debts, or giving bond with security, he parts with his

equity to compel the assignee partner to apply the partnership property to the payment of partnership debts and, therefore, the partnership creditors have no equity or claim to do so. In Ex parte Ruffin, supra, James Cooper entered into covenant with personal surety to pay the debts of the firm and indemnify Thomas Cooper against loss on account of his failure to do so. It was held that he had no equity to call upon the court to apply the proceeds of the partnership property, James Cooper being in bankruptcy, to the payment of the partnership debts. The Lord Chancellor said:

"If it was necessary for the creditors to operate their relief through his equity, he has no equity."

In several of the cases cited the partner receiving the assignment of the interest of the retiring partner promised to pay the partnership debts. It was held that such promise gave to the retiring partner no equity, and therefore the creditors had none, to have the proceeds of the partnership property applied to the payment of their debts. By the assent of the executors, the legatees, Brewer and W. W. Ricks, took title to the legacies under, in accordance with, and subject to the terms of the will, and such title as they took vested in the trustee in bankruptcy of H. E. Brewer; he having purchased the interest of W. W. Ricks. The court of bankruptcy must therefore deal with the property which vested in H. E. Brewer as his individual property in its plight, condition, and title as it was at the date of filing the petition or the adjudication of Brewer.

Item 22 of the will of R. H. Ricks is as follows:

"I give, devise and bequeath to my friend, H. E. Brewer, the one-half interest in the copartnership business carried on in the city of Rocky Mount, North Carolina, under the firm name of H. E. Brewer & Company, not hereinbefore given to Wilson W. Ricks, including alike real estate, stock of merchandise, furniture, fixtures, notes, book accounts, crop liens, mortgages and other choses in action and personal chattels; but, however, not including any indebtedness which may be owing to me by said firm at the time of my death, and subject to all other firm indebtedness, outstanding at such time."

The legacy to Wilson W. Ricks of the other one-half interest is in exactly the same terms.

[8] We are thus brought to the consideration of the contention made by the executors of R. H. Ricks that, by the terms of the will, Ricks retained the equity to which he was entitled at the time of his death to require and enforce, as against Brewer, the equity to have the partnership property applied in exoneration of his personal liability, to the discharge of the partnership debts. It is not very material, for the purpose of this inquiry, whether the words "subject to the payment of the debts," etc., be construed as a condition subsequent or a trust impressed upon the property in the hands of the legatee. It is manifest that it was his intention to attach to his gift the condition that the legatee took the property in the same plight and subject to the same equities upon which he held as partner. Unless this construction is given the language, it has no meaning or import. The words do not impose a mere personal obligation upon the legatees. Lord Chancellor Eldon, in Ex parte Ruffin, supra, had in mind, and noted, this distinction. He says:

"The assignment was not made subject to the payment of the debts. But in consideration of a covenant leaving no duty upon the property, but attaching a personal obligation upon the assignees to pay the debts."

So in Dingeldein v. Third Avenue R. R. Co., 37 N. Y. 575, a deed was executed for property, "subject to the payment by said parties hereto of the second part, of all the money which the said Third Avenue R. R. Co. is bound to pay on account of sewers," etc. Hunt, C. J., said:

"Where land is conveyed simply 'subject to a mortgage,' and there is no express agreement to pay, no agreement will be implied; and no action involving a personal liability can be maintained by the mortgagee against the buyer."

But when the language is "subject to the payment" the grantee assumes a personal liability to pay the debt. An action against the grantee by the holder of the debt was sustained. In that case the debts assumed did not constitute any lien on the property.

In Hoy v. Bramhall, 19 N. J. Eq. 74, it is held that a conveyance of mortgaged property "subject to the payment of all liens thereon" does not create a personal obligation on the vendee to pay the mortgage, or any part of it; but it makes the part so conveyed, as against the residue, subject to its proper proportion of the mortgage debt.

In Goldsmith v. Eichold, 94 Ala. 116, 10 South. 80, 33 Am. St. Rep. 97, Stone, C. J., says:

"One contention is that, by giving and devising all his estate and effects to Bernard, the survivor, Abraham clothed him with the individual right and title to all the property of every kind which had belonged to the partnership, and thereby surrendered any lien he may have had to have the partnership effects applied to the payment of partnership debts. We will not say this could not have been done. Possibly a will containing an express waiver would have cut off the lien; and possibly, if it had directed or authorized a continuance of the business with the firm effects, and it had been so continued, this would have worked a surrender of the lien by necessary implication. But we need not decide this, as the will contains no such provision. On the contrary, it first directs the payment of all of testator's debts, and gives and devises to Bernard only the residue after the payment of the debts." Thayer v. Humphrey, 91 Wis. 276, 64 N. W. 1007, 31 L. R. A. 549, 51 Am. St. Rep. 887.

It is clear that if R. H. Ricks, during his life, had assigned to Brewer and W. W. Ricks his interest in the partnership property in the words used in his will, in the deed of assignment that, in case of insolvency, as against them, he could have maintained a bill to enforce his equity to have the property applied to the payment of the debts. Why may not his executors, for the protection of his estate, do so in this court, when the property is brought into its jurisdiction for administration and distribution? 20 R. C. L. 1032, § 274. This is in accord with the provision of Bankruptcy Act, § 5f (Comp. St. § 9588).

[9] In re Filmar (C. C. A. 7th Cir.) 177 Fed. 170, 100 C. C. A. 632, 24 Am. Bankr. Rep. 194, it appeared that Swigert and Filmar were engaged in business as partners. Swigert sold his interest to Filmar in consideration of a small sum and the agreement to pay the partnership debts. Partnership assets were then in excess of partnership debts. Filmar settled all of the debts except one due to Lippincott.

Filmar was adjudged bankrupt. His assets consisted of goods which were a part of the partnership property, turned over to him by Swigert. The scheduled debts, with the exception of Lippincott's, were the individual debts of Filmar. Lippincott filed a petition to have his debt paid out of the partnership assets ahead of the debts of Filmar's individual creditors. Swigert also filed a petition asking that this be done. Baker, Circuit Judge, said:

"With the property in custody and all the parties present, and no rights of innocent purchasers or transferees having intervened, a court of general equity powers would concededly award priority to Lippincott, because there had been no application of the property, with the consent of the partners, to the payment of individual debts * * * because Lippincott in his own right as a partnership creditor would be entitled to equity's rule of distribution, and because Swigert for his own protection would have the right to ask that Lippincott be first paid."

The learned judge says that it was unnecessary to inquire what procedure Lippincott would have been compelled to resort to because Swigert who was entitled to invoke the aid of the court had come in and asked for the enforcement of his equity. In re Denning (D. C. Mass.) 114 Fed. 219, 8 Am. Bk. Rep. 133.

In Dalton v. Humphreys (C. C. A. 4th Cir.) 242 Fed. 777, Judge Knapp says:

"It may be added, however, that the bankruptcy court had the disputed stock in custody and complete jurisdiction of all the interested parties. As a court of equity, in matters of this kind, it had the undoubted power to make such determination of the controversy as justice appeared to require."

Such rights, or equities, as were reserved to Ricks in respect to the partnership property passed to his executors for the purpose of protecting his estate from loss by reason of the debts of H. E. Brewer & Co. The intervening petition of the executors states that they have paid a portion of the partnership debts and that they will be compelled to pay all of them. It is not material, for the present purpose, to decide whether the creditors may themselves intervene. They are not interested in doing so. They may demand and recover their debts in full against the executors of Ricks. The case has been argued by the counsel for the executors upon the theory that Brewer was in possession of, and dealing with, the partnership property as surviving partner. Much of the argument regarding the rights, powers, and liabilities of surviving partners becomes irrelevant, in the light of the view which I take of the status of H. E. Brewer.

By the purchase of W. W. Ricks' interest, on May 28, 1920, by Brewer, the title to all of the partnership property vested in H. E. Brewer, subject to the payment of the debts of the partnership of H. E. Brewer & Co., of which R. H. Ricks was a partner. His title to the property vested in his trustee in bankruptcy and is being administered by this court as the property of H. E. Brewer, bankrupt.

[10] The executors of R. H. Ricks are entitled, in this proceeding, to call upon the court, in exoneration of the liability of the estate of their testator, to apply the proceeds of the property which was owned by the partnership at the date of the death of R. H. Ricks, February 19, 1920, to the debts against said partnership, then outstanding, unless

such right has been lost by waiver by them, or they are by their conduct estopped from invoking the aid of the court in its enforcement. The executors have not expressly, or by any affirmative act indicating a purpose on their part to do so, waived or surrendered such right or equity to subject the partnership property to the payment of the partnership debts, as their testator retained to his estate by the terms of the bequest of his interest in the partnership property to H. E. Brewer and W. W. Ricks.

[11] The trustee of H. E. Brewer, and several of the individual creditors of Brewer, whose debts were contracted subsequent to the death of R. H. Ricks, insist that, by the course pursued by the executors, with knowledge of the manner in which H. E. Brewer and W. W. Ricks, prior to May 28, 1920, and Brewer subsequent to that time, carried on the business and dealt with the property, are estopped to assert such equity against the individual creditors of Brewer. The referee ruled against this contention and to this ruling they filed petitions for review.

This contention has been ably argued, with the citation of abundant authority, by counsel representing the trustee, creditors, and the executors. When the executors assented to the legacies, they had no further power over, or duty in respect to, the disposition of the property by the legatees, except to protect the estate of their testator against loss by reason of his liability for the partnership debts. This duty they owed to those who were interested in, and liable to sustain loss by reason of the dissipation of, the partnership property.

"If the death of a member" of the partnership "cause the dissolution, the representative or successor to his estate has the clear right to have the partnership effects applied to the payment of partnership debts, in preference to the debts of the survivor, and in like preference of any right he may assert to re-embark them in trade. * * * In the administration and settlement of a firm thus dissolved, the court will enforce the trust in favor of the deceased or bankrupt member's estate, and apply the assets first to the payment of the partnership debts, but not because of any lien or right the creditor or creditors can assert. They have no such lien or right. It is their debtor's right to have the assets thus applied, and in enforcing that clear right, the benefit and preference accrue to the partnership creditor. * * * The preferred payment being the result of the copartner's lien, and not of the creditor's, it follows that, if the partner has done any act by which he surrenders his lien, or estops himself from asserting it, the creditor is equally barred or estopped." Goldsmith v. Eichold, 94 Ala. 116, 10 South. 80, 33 Am. St. Rep. 97.

Passing the question whether the executors, by their conduct, could estop the beneficiaries under the will, the real owners of the estate, from asserting such equity as the testator had, it becomes necessary to ascertain the grounds upon which the alleged estoppel is based. The referee finds that the course pursued by H. E. Brewer and W. W. Ricks was "With the knowledge of the other executors of R. H. Ricks, and without any protest or dissent on their part, until the early part of 1921"; that the notice by H. E. Brewer of March 22, 1920, of the dissolution of the partnership of H. E. Brewer & Co., and for the creditors "to file their claims with the surviving partner," and that this business would be conducted as theretofore, under the same name, by H. E. Brewer and W. W. Ricks as copartners, "was

289 F.—7

published with the knowledge and assent of the executors." On May 28, 1920, Brewer bought the interest of W. W. Ricks in the partnership property, of which notice was published. It is fair to assume that the other executors had knowledge of this purchase.

Neither of these acts of the legatees changed their status towards the property or the relation which it bore to the estate of R. H. Ricks. Those who dealt with H. E. Brewer between March 22d and May 28th had notice, either actual or constructive, and he claimed to own the interest of R. H. Ricks under the terms of his will and "subject to the partnership debts outstanding" of the former partnership. The same is true in respect to the status of Brewer after May 28, 1920. Nothing had been published and no statement made inconsistent with the true situation. The first notice referred to the existence of "partnership debts." Brewer was, in fact, the "surviving partner," but for the reasons set forth herein, he did not, in a legal sense, occupy that relationship to the partnership property. The distinction, so far as the question under consideration is concerned, is not material. It is not suggested that any of the individual creditors of H. E. Brewer were induced to extend credit to him by reason of his description of himself as "surviving partner." If he had occupied that relation to the business, he would not have been authorized to contract new debts, for which the estate of R. H. Ricks could have been held liable, or which could have displaced the rights of his executors, in respect to the partnership property, or its liability for the partnership debts. Bank v. Hollingsworth, supra.

It does not appear from the findings of the referee that, after February 20, 1920, the executors, in their representative capacity, took any action, or made any representation to any person or corporation, extending credit or dealing with H. E. Brewer or W. W. Ricks. They were simply inactive. The referee finds that:

"During the late fall of 1920 and early spring of 1921, H. E. Brewer began to experience financial difficulties" when, under the circumstances stated by the referee, a collector was appointed, February 16, 1921, "on which date H. E. Brewer & Co. as a partnership and H. E. Brewer individually were insolvent."

The referee, it is assumed, meant to find that with the assets of the partnership, existing at the time of the death of R. H. Ricks, the firm was insolvent, which is not denied. In Francis v. McNeal, 228 U. S. 695, 33 Sup. Ct. 701, 57 L. Ed. 1029, L. R. A. 1915E, 706, Mr. Justice Holmes, discussing the "partnership entity doctrine" as recognized in the Bankruptcy Act of 1898, § 5, says:

"Ordinarily it would be impossible that a firm should be insolvent while the members of it remained able to pay its debts with money available for that end."

The estate of Ricks was amply able to pay the partnership debts. On February 16, 1921, there was in existence no such partnership as H. E. Brewer & Co. This, however, is not material to the present investigation. It is not found or suggested by the referee at what time, during the year 1921, H. E. Brewer became insolvent, or when his coexecutors ascertained such insolvency. The finding is that, during

the late fall of 1920 or early spring of 1921, "Brewer experienced financial difficulties." There is no finding that any of the individual debts proven against Brewer's estate were contracted after either of these dates.

In the absence of any act or representation by the executors of R. H. Ricks, which was calculated, or could reasonably, or is alleged in fact to, have induced any of the individual creditors of H. E. Brewer, to extend credit to him upon the belief, induced by the executors, that the partnership property was not liable for the partnership debts the inquiry remains whether, by their failure to act, or by their silence, they are estopped to assert and invoke the aid of the court in enforcing, the equity which their testator had at the time of his death, and retained for the protection of his estate, by the terms of his bequest. This inquiry invites an examination of the principles upon which the doctrine of equitable, or estoppel in pais, is founded. In Barnhardt v. Morrison, 178 N. C. 563, 101 S. E. 218, Mr. Justice Allen says:

"This estoppel arises when any one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts. * * * In order to constitute an equitable estoppel, there must exist a false representation or concealment of material facts, with a knowledge, actual or constructive, of the truth; the other party must have been without such knowledge, or, having the means of knowledge of the real facts, must not have been culpably negligent in informing himself; it must have been intended or expected that the representation or concealment should be acted upon, and the party asserting the estoppel must have reasonably relied on it or acted upon it to his prejudice"—citing 16 Cyc. 722, Eaton's Eq. 169.

" 'Mere silence will not work an estoppel. There must be some other element connected with the transaction and the silence to prevent a person from asserting his rights or claim. And so * * * it is generally affirmed that in order to work an estoppel the silence must be under such circumstances that there are both a specific opportunity, and a real or apparent duty, to speak.' 10 R. C. L. 692.

" 'Undoubtedly mere silence may sometimes be found an estoppel, but it must be when there is a duty and opportunity to speak, when silence either is or operates as a fraud to the consciousness of the party who does not speak, and when he knows or ought to know that some one is relying upon his silence and will be injured by that silence.' In other words, the omission to speak must be, relatively to the party harmed, an actual or constructive fraud."

The authorities sustain these principles. Dickerson v. Colgrove, 100 U. S. 578, 25 L. Ed. 618; Wiser v. Lawler, 189 U. S. 260, 23 Sup. Ct. 624, 47 L. Ed. 802, in which it is said:

"To constitute an estoppel by silence there must be something more than an opportunity to speak. There must be an obligation. This principle applies with peculiar force where the persons to whom notice should be given are unknown." Pomeroy's Eq. 805 et seq.

Applying these principles to the facts found by the referee, several difficulties confront the trustee and individual creditors of H. E. Brewer in maintaining their contention in this phase of the case. There was no duty imposed upon the executors to give notice that by the terms of the will of their testator, he, Brewer, and W. W. Ricks took the bequest "subject to the debts of the partnership outstanding."

The probate and recording of the will in the records of the superior court of Nash county, as required by the statute, was notice to all persons who dealt with the legatees of the terms upon which they took their legacy, and held the property. If they loaned money or sold goods to H. E. Brewer, after he purchased the interest of his colegatee, they are fixed with notice of the terms of the will under which they took the property. The executors were under no legal or moral obligation to anticipate that persons would deal with Brewer, without availing themselves of the sources of knowledge in regard to his title and its encumbrances.

Again, there is no finding by the referee that the executors, other than Brewer, had any knowledge, or information, of the persons who were extending credit to him. The evidence does not sustain the suggestion that they knew of banks and persons who were extending credit to Brewer, nor impose upon them the duty to make inquiry and notify such persons, or banks, of the condition of the title which the public record afforded them. It would seem that ordinary prudence would suggest to a person proposing to extend credit to Brewer, with notice of the death of his partner, to inquire as to the origin and extent of his power to contract debts affecting the partnership property, to examine the public records to ascertain what provisions Ricks had made in his will in regard to the partnership property and its liability for partnership debts.

Persons having notice of the death of one of the partners, dealing with the surviving partner, are bound to inquire how far his authority to make contracts affecting the partnership property extends, what funds are bound by his contracts, and if they trust him beyond the extent of such authority it is their own fault, and they have no right to complain that the law does not afford them any redress. Burwell v. Mandeville's Ex'rs, 43 U. S. (2 How.) 560, 576, 11 L. Ed. 378; Smith v. Ayer, 101 U. S. 320, 25 L. Ed. 955; Wiser v. Lawler, supra. The facts in Hoyt v. Sprague, 103 U. S. 613, 26 L. Ed. 585, were peculiar, and the questions involved and decided do not aid us in the decision of the questions presented here.

The facts found by the referee and sustained by the evidence explain the course pursued by the creditors of the partnership. The ample solvency of the estate of R. H. Ricks assured them that they stood in no danger of sustaining loss by non action in respect to the partnership property. They also knew that the partnership was engaged in a prosperous business—had large real estate holdings. Its solvency was not questioned by any one. H. E. Brewer had been the active partner and manager of the business, and was, by virtue of the bequest to him, the owner of three-fourths of the property. They had no reason to press the immediate payment of their debts. The same is true in regard to the executors. They understood that the partnership, prior to the death of Ricks, had, as was usual in the character of the business in which for many years it had been, and was then, engaged, entered into contract with their customers, a very large proportion of whom were engaged in farming, making crops which required a year to plant, gather, and sell, to make advancements to them in sup-

plies and fertilizers. To have immediately upon the death of Ricks required the business to be suspended, the property sold, and debts collected would have been disastrous to all concerned. There was nothing, so far as the referee's findings go, to cause the executors to apprehend loss by permitting Brewer and W. W. Ricks, and after May 28, 1920, Brewer as the purchaser of the interest of Ricks, to pursue the course found by the referee, at least for the current year. The findings exclude the suggestion that his financial condition prior to "the late fall of 1920" was such as to impose upon the executors the duty to assert the right and equity vested in them in regard to the partnership property and debts. Brewer had not sold, or, except by securing the purchase price of his purchase from W. W. Ricks, incumbered, any portion of the partnership property.

The trustee and petitioning creditors cite, and strongly urge as a controlling authority, to sustain their view, the case of Dalton v. Humphrey (C. C. A. 4th Cir.) 242 Fed. 777. I have carefully examined the facts and the opinion of Judge Knapp. In so far as the decision is applicable, I would regard it as controlling authority. For an understanding of the scope of the decision, a statement of the essential facts is necessary:

Robert Harris and his brother, H. C. Harris, were partners in business. As such partners they owned shares of stock in the Citizens' Bank. They became indebted to the bank, represented by firm notes. A provision in the charter secured to the bank a lien upon the stock for any indebtedness due the bank by a stockholder, in preference to other creditors. The loans were made upon the faith of this provision. H. C. Harris died in April, 1911, leaving a will in which he gave his entire interest in the partnership to his son, W. C. Harris. The will was duly probated. No executor or administrator was appointed. Acting upon the bequest, the son at once assumed the place of his deceased father in the partnership and the business went on as before, under the same firm name and without any public announcement of the change in the personnel, except that the name of W. C. Harris was printed on the letter heads. The bank notes were renewed at intervals of three or four months, after the death of H. C. Harris.

When W. C. Harris came into the firm, the bank was assured, both by him and R. C. Harris, that the business would continue as before, and that the bank would have its lien on the stock, worth more than the loan; and so the loan was continued by successive renewals of the notes for two years, during which a large part of the debts of the old firm were paid and fresh indebtedness incurred by the new firm. In June, 1913, the firm and the individual members were adjudged bankrupt. The bank proved its debt and claimed its lien on the stock. The trustee conceded that the bank was entitled to the lien. In a suit instituted in the state court by certain creditors of the old firm, a receiver was appointed of the partnership, composed of H. C. and R. C. Harris, who intervened in the bankruptcy proceeding, alleging that the partnership had been dissolved by the death of H. C. Harris and that its affairs had not been closed; that its assets were insufficient to pay its creditors; that as receiver he was entitled to its property,

including the shares of stock in the bank; that the assets should be applied to the payment of the debts of the old firm. To a report by the special master sustaining the bank's lien, and that the title to the stock was vested in the trustee, exceptions were filed by the receiver, who appealed from the judgment conferring the master's report. Judge Knapp says:

"So far as the record discloses, the litigation under review is confined to the bank stock, and involves (1) the right of the bank to a lien thereon;  *  *  * and (2) the title to the stock as between the trustee and the receiver.  *  *  * The situation is this: When H. C. Harris died, the old firm was dissolved, and the title to its assets vested in Robert Harris, the surviving partner, with the right, acting in good faith, to make any valid disposition of the same. Fitzpatrick v. Flannagan, 106 U. S. 648, 657, 1 Sup. Ct. 369, 27 L. Ed. 211. But W. C. Harris, as legatee of his father, owned an undivided half of the partnership property, and manifestly Robert Harris could recognize that ownership and admit his nephew to joint possession without the aid of an administrator. Nor does it seem to us doubtful, under the authority just cited, that the surviving partner of the old firm, in the absence of protest or adverse action by creditors, could exercise his right to dispose of its assets by transferring the same, for the consideration of agreeing to pay its debts, to a new firm composed of W. C. Harris and himself, who were already in possession of the property. Assuming that all parties acted with honest intent, as appears to be conceded, and that the creditors assented to a continuance of the business by the new firm, the evident effect of the arrangement was to make that firm the owner of the stock in question. It thereby became the actual stockholder, in place of the old firm, and its indebtedness to the bank was, therefore, secured by the lien imposed upon its stock by the terms of the bank's charter."

The learned judge proceeds to hold that, by the failure of the creditors to require the partnership to be "wound up" and its property applied to the payment of their debts, and "without protest or objection" allowing the new firm to take up the business and carry it on for more than two years, and making no dissent until after bankruptcy, by such long acquiescence, manifested at least by nonaction, a strong presumption is raised—

"that the new firm succeeded the old firm taking over its assets and assuming its liabilities, with the knowledge and consent of the former's creditors.  *  *  * This being so, it appears plain to us that a few creditors of the old firm  *  *  * should not now be permitted to upset an arrangement to which they presumably consented and which at the time was undoubtedly deemed best for all concerned."

This conclusion is based upon the Fitzpatrick and Beauregard Cases, supra. The decision, so far as it affects the right of the bank to the lien on the stock, rests upon the fact that the members of the new firm expressly recognized and assented to statutory lien. The right of the trustee to the stock, after paying the bank's debt, rests upon the conclusion of the court that the creditors assented to the manner of dealing with the partnership property in view of the facts found by the special master. The learned judge places his conclusion upon the assent by the creditors of the old firm to the assumption by the new firm of the debts. In the absence of any express or affirmative assent, the principle upon which they lost the right to have the partnership property applied to the payment of their debts is that of equitable es-

toppel. Judge Knapp, referring to the course pursued by the creditors of the old firm, says:

"Without protest or objection they allowed the new firm to take up the business and carry it on for more than two years; there was no dissent until after the bankruptcy. In the circumstances, this long acquiescence, manifested at least by nonaction, raises a strong presumption that the new firm succeeded the old firm, taking over its assets and assuming its liabilities, with the knowledge and consent of the former's creditors."

It appears that, during the time which the new firm was operating, "a large part of the indebtedness of the old firm to other creditors was paid off and fresh indebtedness incurred by the new firm." In the Dalton Case the deceased partner bequeathed to his son his interest in the partnership property, without reserving to his representative his equity or lien by subjecting the property to the payment of the partnership debts. In this respect the case is distinguished from the instant case.

[12] In a very careful and exhaustive review of the variant and varying rules laid down by English chancellors and American judges regarding the application of the assets of bankrupt partnerships and individual partners, Judge Lowell (In re Wilcox [D. C.] 94 Fed. 84) gives an interesting history of the more or less discordant decisions of English and American courts and provisions of the Bankruptcy Acts of 1800 (2 Stat. 19), 1841 (5 Stat. 440), and 1867 (14 Stat. 517). He reaches the conclusion that the act of 1898 (Comp. St. §§ 9585–9656), in respect to partnerships, differs materially from those statutes as shown by the provisions of section 5f, g, h. This opinion is referred to by Chief Justice White in Farmers' Bank v. Ridge Avenue Bank, 240 U. S. 498, 36 Sup. Ct. 461, 60 L. Ed. 767, L. R. A. 1917A, 135. While the questions involved in these cases are not the same as here, there is found in both opinions a recognition of the fact that the Bankruptcy Act of 1898 disposes of many of the questions relating to proceedings in bankruptcy in the administration of partnership property. The provisions of section 5f, g, clearly indicate a purpose on the part of Congress to direct the settlement of bankrupt partnership estates by statutory provisions rather than by an appeal to suits in equity, as was formerly done. There is a manifest purpose to provide for the application of partnership assets to partnership debts and individual property to individual debts. This is the principle by which courts of equity are guided.

It may be that the novel conditions presented in this case could have been dealt with more satisfactorily and the equities of the parties interested presented more clearly, by a suit in equity. The evidence taken before the referee and his conclusions of fact and law, with the petitions for review, bring before the court the essential questions involved with sufficient clearness. I did not deem it advisable to have the estate burdened with the cost and delay of a suit in equity. While I am not inadvertent to the doubts and difficulties presented upon the record, and the equities of the individual creditors of H. E. Brewer, as the result of anxious consideration, I reach the conclusion that, by the terms used by R. H. Ricks in giving what he and his legatees re-

garded as a valuable legacy to his friend and partner, in recognition of his services in building up a large and prosperous business, one half, and to his nephew, who had been employed by the firm, the other half, of his interest, he preserved to his estate his equity to have the partnership property carry the burden of its indebtedness and that they took it subject to this burden, while, by reason of conditions which neither he nor his representatives could have anticipated, the legacies, instead of being "assets," became "liabilities."

The several debts, in regard to which it is claimed that there are differentiating elements will be dealt with separately:

### Debt of Wilson W. Ricks.

[13] On March 6, 1920, H. E. Brewer published a notice in the Rocky Mount Evening Telegram that the firm of H. E. Brewer & Co. was dissolved by the death of R. H. Ricks; also containing the statement that the business would be conducted as theretofore under the same name by H. E. Brewer and W. W. Ricks as copartners. This notice was published with the knowledge or consent of the executors of R. H. Ricks. W. W. Ricks denies that he consented to, or had knowledge of, the publication. For the reasons stated hereinafter, this is not material. The referee does not find otherwise, or more definitely, whether a partnership was in fact formed by H. E. Brewer and W. W. Ricks. The evidence shows that, prior to the death of R. H. Ricks, W. W. Ricks was employed by the firm as a salesman, at a fixed salary; that thereafter he continued in the same relation with H. E. Brewer. I do not think that the evidence sustains the contention that he entered into a contract creating a partnership with Brewer. He testified that he did not know that such a notice, or any notice, had been published by Brewer until late in the spring of 1920, after he had sold his interest to Brewer.

Brewer does not testify to any contract of partnership. After the death of R. H. Ricks, he continued to draw the same salary as before. H. E. Brewer could not, consistently, maintain the status of "surviving partner" of the old firm, and at the same time, in respect to the same business, the same property, a partner in a new firm. I am of the opinion that, in the light of conditions and the viewpoint of all of the persons concerned, H. E. Brewer, with no thought of involving W. W. Ricks or any one else, had the notice published, without any purpose of thereby creating a partnership, but recognizing the fact that the partnership property, by the terms of the will of R. H. Ricks, was owned by W. W. Ricks and himself, and that, as he intended to carry on the business, thinking that it was or would be agreeable to W. W. Ricks, he published the notice that the business would be continued by W. W. Ricks and himself under the same name as before. He says that he considered him a partner, because R. H. Ricks had given him one-fourth interest. There is no evidence that any specific debt was contracted between March 6 and May 28, 1920, or that any person dealt with H. E. Brewer & Co., or extended credit to Brewer, by reason of the notice.

With this explanation of the status of W. W. Ricks, which is sustained by the evidence, he sold his interest in the property to H. E. Brewer May 28, 1920. A statement of estimated values of property and debts was made by the bookkeeper as a basis for the sale, showing property valued at $250,000, debts $130,000, net balance $120,000. Brewer agreed to pay for Mr. W. W. Ricks' one-fourth interest $30,000, for which he executed deed to Brewer, which was duly recorded. No cash was paid, but on same day Brewer and wife executed to J. P. Bunn, trustee, a deed conveying a portion of the property owned by H. E. Brewer & Co. prior to the death of R. H. Ricks, to secure three notes of $10,000 each, due January 1, 1921, 1922, and 1923, on account of which $5,000 and interest to January 21, 1921, has been paid.

I am unable to see how the sale to Brewer by W. W. Ricks, and the execution of the notes and mortgage on the same property to secure the purchase price, changed the status of Ricks towards the estate of R. H. Ricks in respect to the partnership property and its liability for the partnership debts. If I am correct in holding that Brewer and W. W. Ricks took title under the will subject to the equity or lien which vested in their testator, Brewer took title to W. W. Ricks' one-fourth interest subject to the same liability or burden, and Bunn, as trustee, took the mortgage on the same property upon the same terms as W. W. Ricks held title. A court of equity has regard to the substance and not the form which a transaction assumes. No new parties, claiming as purchasers for value without notice of equities or rights, have acquired rights in the property. While W. W. Ricks fails to receive the purchase price of his legacy, he sustains no less by reason of the sale. He sold to his colegatee what he got under the will, and has a security for the price or a lien on the same property, which both legatees took "subject to the partnership debts outstanding" at the date of the vesting of their legacies. He does, however, by the sale acquire a right to share in any surplus of the partnership assets, and in the individual assets of H. E. Brewer. To this extent he saves something out of wreck, whereas Brewer gets nothing of value, either from his own or the legacy to W. W. Ricks, for which he promised to pay $30,000 and has paid $5,000. The classification of the debt due W. W. Ricks is approved.

### The Norfolk National Bank Claim.

[14] The referee finds that the bank has proven a claim for $32,996.13, with interest. Said claim consists of three promissory notes, all signed by "H. E. Brewer & Co., by H. E. Brewer," copartner, for money loaned and bearing date January 17, 1921, for $15,000 January 19, 1921, and January 17, 1921, $3,250. The debt, evidenced by these notes, was contracted during the month of June, 1920, for $55,000, of which amount $45,000 was paid by Brewer to the F. S. Royster Guano Company, and $10,000 left on deposit as per agreement when loan was made.

On June 1, 1920, H. E. Brewer & Co., by H. E. Brewer, submitted to the Norfolk National Bank a financial statement, showing a net worth of $138,904.75; said statement being as of the date given and on stationery on which (at top of right and left corners) appeared the

name of H. E. Brewer and R. H. Ricks. The referee finds that the Norfolk National Bank had actual notice of the death of R. H. Ricks. (Finding No. 3.) There is a finding respecting the disposition of some collaterals held by the bank, which is not material to the decision of the questions presented upon the petition for review.

The referee placed this claim in class No. 3, thus excluding it from participation in the proceeds of the partnership property until the partnership debts are paid. To this classification the bank filed its petition for review. I find no facts applicable to the status of this debt which differentiates it from other debts contracted by H. E. Brewer after the death of R. H. Ricks. The money was loaned four months after the dissolution of the partnership by the death of R. H. Ricks, of which the bank had notice. The correctness of the ruling of the referee is, of course, dependent upon the decision of the contentions raised by the executors of R. H. Ricks, the trustee, and creditors of H. E. Brewer respecting the status of the debts contracted subsequently to the death of Ricks. The classification made by the referee is approved.

### National Bank of Rocky Mount.

[15] By a supplemental report the referee finds conclusions of fact in regard to the claim of the National Bank of Rocky Mount. This claim is based upon a note for $10,000, bearing date November 14, 1919, due January 13, 1920, executed by H. E. Brewer & Co., renewed January 13, 1920, all of said dates prior to the death of R. H. Ricks; renewed March 18, June 11, September 8, and November 8, 1920, and January 6, 1921, subsequent to his death; a note for $5,000, executed by H. E. Brewer & Co. December 5, 1919, to Toisnot Banking Company, December 5, 1920, and renewed on that date, due March 6, 1920, with the following provision:

"This is an extension of a $5,000 note to the Toisnot Banking Company, due to-day, and taken up by the said bank and retained without release of R. H. Ricks, partner."

These notes are placed in class 1.

### Rocky Mount Savings & Trust Company.

(a) Note for $5,000, executed by H. E. Brewer & Co., December 10, 1919, to Toisnot Banking Company, and assigned to Rocky Mount Savings & Trust Company under same conditions as claim No. 1, National Bank of Rocky Mount.

(b) Note for $5,000, executed by H. E. Brewer, of date October 19, 1916; last renewal, December 20, 1920.

(c) Note for $1,000, executed by H. E. Brewer & Co., September 20, 1919; last renewal, January 1, 1921.

These notes are placed in class 1.

### D. J. Rose Claim.

"Balance due on building account for partnership store; note for said account made November 20, 1920, due in 90 days." Class 1.

The trustee excepts to the classification of the foregoing debts due

the National Bank of Rocky Mount, the Rocky Mount Savings & Trust Company, and D. J. Rose, for that the renewal of the original notes, and the account, operated as a novation, releasing the partnership and estate of R. H. Ricks, and imposing liability upon H. E. Brewer individually. This contention presents the question whether the referee's finding of fact, in respect to said notes and the account of D. J. Rose, constitutes a novation.

"It is equally well settled that the giving of a note or draft for an existing indebtedness does not operate, unless so agreed by the parties, to extinguish the original indebtedness, and upon the dishonor of the note or draft the creditor may sue upon the original consideration." Bank v. Hollingsworth, 135 N. C. 556, 47 S. E. 618.

"Whether the taking of a new security of equal dignity is to be treated as a novation, or substitution for and an extinguishment of a prior indebtedness, is a matter of intention, to be determined from all the facts and circumstances of the case. But, in the absence of satisfactory proof to the contrary, the presumption is that the debt has not been extinguished by taking a new evidence of indebtedness." 20 R. C. L. 363, 364.

"Generally, unless it is otherwise specifically agreed, if the holder of a promissory note takes a new note for the original debt, that is prima facie a conditional payment only—that is, the original debt will be extinguished on the payment of the substituted note and there is not a novation. * * * In order to effect a novation, there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement; for it is a well-settled principle that novation is never to be presumed. * * * The point in every case, then, is: Did the parties intend by their arrangement to extinguish the old debt and obligation, and rely entirely on the new, or did they intend to keep the old alive, and merely accept the new as further security? And this question of intention must be decided from all the circumstances." 20 R. C. L. 364–366.

No new parties were brought into the contract by the renewals, nor did any new consideration move the parties to make them. The renewal notes were signed, "H. E. Brewer & Co., by H. E. Brewer." There was no substitution of the original makers, nor assumption of liability for the debt, by a stranger to the note, and both these elements are essential to a novation.

"A novation, as understood in modern law, is a mutual agreement between all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another, or a like agreement for the discharge of a debtor to his creditor by the substitution of a new creditor." 20 R. C. L. 360.

The referee correctly placed these debts in the same class as other debts of the partnership "outstanding at the date of the death of R. H. Ricks."

### The Southern Cotton Oil Company.

This claimant has filed a large number of exceptions to the referee's findings of fact and of law, which will require a careful examination of the evidence. The disposition of this claim is reserved for that purpose.

[16] In dealing with the questions raised by the petitions for review and the administration of the property, I have made no distinction between the real and personal property of the partnership. I have

treated, for the purpose of administration, the realty the same as the personal property, as do courts of equity.

"It is a general rule that, when real estate is purchased with partnership funds for partnership purposes and without any intention of withdrawing the funds from the firm for the use of all or any of the members thereof as individuals, such real estate is to be considered as partnership property, and as liable to all the equitable rights of the partners between themselves. The result of this rule is that each partner has an equity to insist upon a sale of such real estate; it is to be treated as personalty for purposes of the partnerhip." Bispham, Eq. § 511.

While I am of the opinion, for the reasons stated, that the executors assented to the legacies to H. E. Brewer and W. W. Ricks, I do not perceive that, if I had adopted the view that Brewer, after the death of R. H. Ricks, sustained to the partnership property of surviving partner, a different result as to the administration of the property would have been reached. The adoption of the "surviving partnership" view would have resulted in several anomalies, but either view is subject to the same criticism. As said by Lord Chancellor Eldon, supra, "the case is new in its circumstances," and bristling with difficulties.

This opinion will be certified to the referee, with directions to proceed with the administration of the estate upon the principles set forth.