JEROME J. KAUFMAN AND JANET KAUFMAN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1379–69, 1381–69, 1382–69, 1384–69.   Filed March 24, 1971.

*Robert B. Hodes* and *Jack H. Nusbaum,* for the petitioners.
*Buckley D. Sowards,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in petitioners' Federal income tax for taxable years 1964 and 1965 as follows:

| Petitioner | Deficiency | |
| --- | --- | --- |
| | 1964 | 1965 |
| Jerome J. Kaufman and Janet Kaufman, docket No. 1379–69 | $2, 572, 834. 00 | ---------- |
| Joel A. Kaufman, docket No. 1381–69 | 8, 593. 41 | $500. 01 |
| James M. Kaufman, docket No. 1382–69 | 8, 617. 98 | 500. 00 |
| Jeffrey S. Kaufman and Stephanie Kaufman, docket No. 1384–69 | 8, 461. 95 | 1, 186. 95 |
| | 2, 598, 507. 34 | 2, 186. 96 |

[1] Cases of the following petitioners are consolidated herewith: Joel A. Kaufman, docket No. 1381–69; James M. Kaufman, docket No. 1382–69; and Jeffrey S. Kaufman and Stephanie Kaufman, docket No. 1384–69.

The petitioners in docket Nos. 1381–69, 1382–69, and 1384–69 have conceded their liability for the 1965 deficiencies.

The sole issue for our consideration is whether, in 1964, petitioners are taxable on gains realized when preferred stock of a corporation, with dividends in arrears, was exchanged for common stock of the same corporation, or whether the transaction was a nontaxable reorganization, i.e., a recapitalization under section 368(a)(1)(E),[2] I.R.C. 1954.[3]

### FINDINGS OF FACT

The facts herein are fully stipulated and are found accordingly. Briefly summarized they are as follows.

Petitioners Jerome J. and Janet Kaufman, husband and wife, are individuals who resided in Akron, Ohio, at the time the petition herein was filed. Jerome J. and Janet Kaufman filed a joint income tax return for the taxable year 1964 with the district director of internal revenue, Cleveland, Ohio.

Joel A. Kaufman, son of Jerome J. Kaufman, is an individual who resided in Akron, Ohio, at the time the petition herein was filed. Joel A. Kaufman filed an income tax return for the taxable year 1964 with the district director of internal revenue, Cleveland, Ohio.

James M. Kaufman, son of Jerome J. Kaufman, is an individual who resided in Coral Gables, Fla., at the time the petition herein was filed. James M. Kaufman filed an income tax return for the taxable year 1964 with the district director of internal revenue, Cleveland, Ohio.

Jeffrey S. and Stephanie Kaufman, husband and wife, are individuals who resided in Coral Gables, Fla., at the time the petition herein was filed. Jeffrey S. and Stephanie Kaufman filed a joint income tax return for the taxable year 1964 with the district director of internal revenue, Jacksonville, Fla.

JJK Corp. (hereinafter referred to as JJK) was incorporated in the State of Ohio on June 15, 1960. Jerome J. Kaufman became president and continued as such during all times pertinent hereto. The authorized capitalization of JJK consisted of 1,000 shares of common stock without par value and 128,000 shares of preferred stock with par value of $100 a share. 300 shares of such common stock were issued for a cash consideration of $80 a share aggregating $24,000. 127,336 shares of preferred stock were issued in exchange for 578.80

---

[2] SEC. 368(a). REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

\* \* \* \* \* \* \*

(E) a recapitalization ; or

[3] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

shares of Alside, Inc., common stock. Jerome J. Kaufman was the controlling stockholder of Alside, Inc., prior to this date. Each share of stock, common and preferred, was entitled to one vote.

The initial holders of JJK common stock were as follows:

| Name | Common stock, number of shares |
|---|---|
| Jerome J. Kaufman, as trustee [4] for the benefit of Joel A. Kaufman | 100 |
| Jerome J. Kaufman, as trustee [4] for the benefit of James M. Kaufman | 100 |
| Jerome J. Kaufman, as trustee [4] for the benefit of Jeffrey S. Kaufman | 100 |

The initial holders of JJK preferred stock were as follows:

| Name | Preferred stock, number of shares |
|---|---|
| Jerome J. Kaufman | 91,159 |
| Janet Kaufman | 36,177 |

JJK Corp. preferred stock carried with it the following right:

(5) LIQUIDATION—In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, the holders of the Preferred Stock shall be entitled, before any distribution or payment shall be made to the holders of the Common Stock, to be paid an amount equal to the then "liquidating value" of such Preferred Stock. The term "liquidating value" when used herein with reference to the Preferred Stock shall mean an amount equal to the par value per share plus all unpaid cumulative dividends accrued thereon to the date of liquidation. After payment to the holders of the Preferred Stock of the amounts to which they are entitled as aforesaid, the balance, if any, shall be paid to the holders of stock subordinate to the Preferred Stock according to their respective rights. In case the net assets of the Corporation are insufficient to pay to holders of all outstanding shares of Preferred Stock the full amount to which they are, respectively, entitled, the entire net assets of the Corporation remaining shall be distributed ratably to the holders of all outstanding shares of Preferred Stock in proportion to the full amounts to which they are respectively entitled. The consolidation or merger of the Corporation into or with any other corporation or corporations pursuant to the applicable statutes providing for consolidation or merger shall not be deemed a liquidation, dissolution or winding up of the affairs of the Corporation within the meaning of any of the provisions of this paragraph (5).

On June 16, 1960, by reason of a recapitalization of Alside, Inc., the 578.80 shares of Alside, Inc., common stock referred to above were converted into 1,157,600 shares of Alside, Inc., class B common stock. 300,000 shares of Alside, Inc., common stock were offered and sold to the public by Alside, Inc., at a price of $11 a share. The initial public offering of Alside, Inc., common stock was on June 20, 1960. The class B common stock differed from the common stock thereafter held by the public in that dividends could lawfully be declared on common stock of Alside, Inc., without dividends being declared on class B common stock; the class B common stock was convertible into common stock share-for-share, at the option of the holder.

---

[4] The trusts were formed by Jerome J. Kaufman on June 13, 1960.

On June 20, 1960, the class B common stock of Alside, Inc., was held as follows:

| Name | Amount owned | Percentage of class |
|---|---|---|
| JJK Corporation | 1, 157, 600 | 74 |
| Manuel M. Kaufman | 164, 720 | 10. 5 |
| All directors and officers as a group | 218, 160 | 13. 8 |

In July 1961, 200,000 shares of class B common stock were sold by the following and converted into common stock of Alside, Inc., by the purchasers:

| Name | Number of shares |
|---|---|
| Janet Kaufman | 92, 600 |
| Jerome J. Kaufman | 59, 000 |
| Manuel Kaufman | 21, 000 |
| Ruth Manes | 21, 000 |
| Eleanor Mentall | 6, 400 |

The shares of class B common stock which were sold by Jerome J. Kaufman and Janet Kaufman were received by them on June 12, 1961, from JJK Corp., in redemption of 41,782 shares of preferred stock of JJK Corp.

JJK Corp., Ohio, received dividends in respect of holdings in Alside, Inc., as follows:

| Year | Dividends received |
|---|---|
| 1961 (first return) | $11,576 |
| 1962 | 10, 060 |
| Dec. 1, 1962–Feb. 12, 1963 | 10, 058 |

During the years 1961, 1962, and the period December 1, 1962, through February 12, 1963, JJK Corp., Ohio, was a personal holding company. On or about February 12, 1963, JJK was merged with and into a Delaware corporation of the same name, the surviving corporation (hereinafter also referred to as JJK) having the same business, management, property, and capitalization as that of the Ohio corporation which disappeared in the merger.

By November 30, 1963, all class B common stock of Alside, Inc., had been converted into common stock.

From 1963 to 1965 JJK received dividends in respect of its holdings in Alside, Inc., as follows:

| Years ending | Dividends received |
|---|---|
| 1963 | $101, 529. 25 |
| 1964 | 205, 052. 60 |
| 1965 | 307, 578. 90 |

On April 21, 1964, there were accrued unpaid dividend arrearages on the outstanding preferred stock of JJK of $23.79 per share or $2,029,049.10. On April 21, 1964, the board of directors of JJK adopted a plan for the recapitalization of JJK whereby the outstanding preferred stock of JJK would be exchanged for 2181.52056 shares of common stock of JJK. The aforesaid dividend arrearages were to be

canceled and eliminated pursuant to such plan. On April 21, 1964, JJK was recapitalized. Pursuant to the aforesaid plan, the preferred stock dividend arrearages were eliminated and the preferred stock was exchanged for JJK common stock as follows:

| Stockholder | Preferred stock exchanged | Common stock received |
|---|---|---|
| Jerome J. Kaufman | 72, 999 | 1, 848. 33 |
| Janet Kaufman | 10, 656 | 269. 81 |
| Kaufman Foundation | 660 | 16. 71 |
| Jeffrey S. Kaufman | 219 | 5. 55 |
| Jerome J. Kaufman, as custodian for Joel A. Kaufman | 219 | 5. 55 |
| Jeffrey S. Kaufman, as custodian for John M. Kaufman | 159 | 4. 03 |
| Jeffrey S. Kaufman, as custodian for Jerome J. Kaufman II | 159 | 4. 03 |
| James M. Kaufman | 219 | 5. 55 |

On the date of JJK's recapitalization the value of Alside, Inc., common stock on the New York Stock Exchange was 18.625.

On November 17, 1965, the board of directors and shareholders of JJK adopted a plan of liquidation and dissolution for JJK. On November 19, 1965, JJK was liquidated and the shareholders received the proceeds of the liquidation in exchange for their stock of JJK in proportion to the amounts held by them as follows:

| Stockholder | Common stock held at the time of liquidation |
|---|---|
| Jerome J. Kaufman | 1, 848. 33 |
| Janet Kaufman | 269. 81 |
| Kaufman Foundation | 16. 71 |
| Jeffrey S. Kaufman | 5. 55 |
| Jerome J. Kaufman, as custodian for Joel A. Kaufman | 5. 55 |
| Jerome J. Kaufman, as trustee for Jeffrey S. Kaufman by trust dated June 13, 1960 | 600. 00 |
| Jerome J. Kaufman, as trustee for James M. Kaufman by trust dated June 13, 1960 | 600. 00 |
| Jerome J. Kaufman, as trustee for Joel A. Kaufman by trust dated June 13, 1960 | 600. 00 |
| Jeffrey S. Kaufman, as custodian for John M. Kaufman | 4. 03 |
| Jeffrey S. Kaufman, as custodian for Jerome J. Kaufman II | 4. 03 |
| James M. Kaufman | 5. 55 |

Pursuant to the plan of liquidation, the assets of JJK were distributed as follows:

| | |
|---|---|
| Jerome J. Kaufman | $25,348.12 cash; 461,205 shares of Alside, Inc., common stock; Marlo Towers and oil and gas interests (aggregate value $354,654) |
| Janet Kaufman | $3,696.10 cash; 72,085 shares of Alside, Inc., common stock |
| Kaufman Foundation | $231.66 cash; 4,464 shares of Alside, Inc., common stock |
| Jeffrey S. Kaufman | $77.65 cash; 1,483 shares of Alside, Inc., common stock |

| | |
|---|---|
| James M. Kaufman_____ | $77.66 cash; 1,483 shares of Alside, Inc., common stock |
| Jerome J. Kaufman, as custodian for Joel A. Kaufman. | $77.65 cash; 1,483 shares of Alside, Inc., common stock |
| Trust for James M. Kaufman_ | $8,226.66 cash; 160,302 shares of Alside, Inc., common stock |
| Trust for Jeffrey S. Kaufman_ | $8,226.66 cash; 160,302 shares of Alside, Inc., common stock |
| Trust for Joel A. Kaufman___ | $8,226.66 cash; 160,302 shares of Alside, Inc., common stock |
| Jeffrey S. Kaufman, as custodian for John M. Kaufman. | $54.36 cash; 1,077 shares of Alside, Inc., common stock |
| Jeffrey S. Kaufman, as custodian for Jerome J. Kaufman II. | $54.36 cash; 1,077 shares of Alside, Inc., common stock |

On the date of JJK's liquidation, the quoted mean value of Alside, Inc., common stock on the New York Stock Exchange was 10.875.

Petitioners treated the recapitalization of JJK as a nontaxable transaction and did not report any realized gain as taxable gain in 1964. The Commissioner determined that the realized gain was to be recognized in 1964 and issued his deficiency notice. In the statement attached to the notice in each docket, the Commissioner explained:

In a recapitalization of JJK Corporation which occurred in April 1964, you exchanged * * * shares of preferred stock having a basis of * * * for common stock having a value of * * *. It is determined that the gain of * * * which you realized upon the recapitalization is recognized gain under Sections 1001 and 1002 of the Internal Revenue Code, subject to the 50% capital gains deduction allowed by Section 1202.

OPINION

The only issue facing us is that of the nature of the recapitalization of JJK in 1964. Petitioners contend it was a tax-free reorganization, i.e., "recapitalization" under section 368(a)(1)(E), *supra*, whereas the Commissioner contends the recapitalization was not a tax-free "recapitalization" within that section because it lacked a proper business purpose and was not undertaken with a view toward continuation of the business enterprise under the modified form.

The Commissioner's argument, briefly put, is as follows. Prior to February 12, 1963, JJK was a personal holding company, subject to section 541, I.R.C. 1954, *et seq.*

In February 1963, JJK merged into a Delaware corporation of the same name having the same business, property, and other attributes of Ohio JJK, which then became defunct. Further, as the result of several business transactions, JJK became *not* subject to section 541, I.R.C. 1954, *et seq.*, for 1963. (Imposition of Personal Holding Company Tax.)

The Revenue Act of 1964 (enacted February 26, 1964) amended the personal holding company provisions of the Code so as to bring within their scope many companies which formerly were not subject thereto. However, Congress, realizing that such a sudden change would be unfair to these companies, enacted certain relief measures which were effective if the corporations liquidated before a certain date, i.e., January 1, 1967.[5]

Meanwhile JJK's principal asset, Alside stock, was declining in value, the Commissioner says. Petitioners were aware, since they controlled JJK, that Alside would have to declare dividends to bolster public confidence in Alside. Also, petitioners apparently knew that if JJK were liquidated, any dividends from Alside would be subject to high individual tax rates.

The Commissioner argues that:

It is obvious that petitioners opted for the relief provisions * * * of the Revenue Act of 1964 and section 333(g) of the Internal Revenue Code of 1954, which was added by the Act. By so doing, JJK paid the lower corporate rate of tax on dividends and they were taxed to petitioners at the capital gains rate upon liquidation of JJK on November 19, 1965. JJK received dividends in respect of its holdings in Alside, Inc. stock in the amounts of $205,052.60 for the year 1964 and $207,578.90 for the year 1965.

This is borne out, he says, by the following events. On April 21, 1964, the board of directors of JJK adopted a plan of recapitalization whereby the outstanding preferred stock of JJK would be exchanged for 2181.52056 shares of JJK common stock. Pursuant thereto, the dividend arrearages on the preferred stock were to be canceled and eliminated.

---

[5] SEC. 333. ELECTION AS TO RECOGNITION OF GAIN IN CERTAIN LIQUIDATIONS.

(g) SPECIAL RULE.—

(1) LIQUIDATIONS BEFORE JANUARY 1, 1967.—In the case of a liquidation occurring before January 1, 1967, of a corporation referred to in paragraph (3)—

(A) the date "December 31, 1953" referred to in subsections (e)(2) and (f)(1) shall be treated as if such date were "December 31, 1962," and

(B) in the case of stock in such corporation held for more than 6 months, the term "a dividend" as used in subsection (e)(1) shall be treated as if such term were "long-term capital gain."

Subparagraph (B) shall not apply to any earnings and profits to which the corporation succeeds after December 31, 1963, pursuant to any corporate reorganization or pursuant to any liquidation to which section 332 applies, except earnings and profits which on December 31, 1963, constituted earnings and profits of a corporation referred to in paragraph (3), and except earnings and profits which were earned after such date by a corporation referred to in paragraph (3).

*　　*　　*　　*　　*　　*

(3) CORPORATIONS REFERRED TO.—For purposes of paragraphs (1) and (2), a corporation referred to in this paragraph is a corporation which for at least one of the two most recent taxable years ending before the date of the enactment of this subsection was not a personal holding company under section 542, but would have been a personal holding company under section 542 for such taxable year if the law applicable for the first taxable year beginning after December 31, 1963, had been applicable to such taxable year.

The shares of preferred stock with a par value of $100 were reclassified into common shares with a par value of $1 at a rate of 0.02532. 83,655 of the 85,290 issued and outstanding preferred shares were in the name of Jerome J. and Janet Kaufman. Thus, after the reclassification, their holdings were reduced from 83,655 shares of preferred stock, with a total value of $8,365,500, to some 2,118 shares of common stock out of a total of 2,160 shares, with a total par value of about $2,118 and $2,160, respectively. They also relinquished a 6-percent cumulative dividend (resulting to date in a dividend arrearage of $23.79 a share) and the right to full payment of accrued dividends prior to payment of dividends on the common stock of the corporation.

At the time of incorporation of JJK in 1960, the market value of Alside, Inc., common stock was $11 a share. As stated above, the value of Alside, Inc., stock had been steadily declining. Jerome J. Kaufman, as president of Alside, Inc., and JJK, was well aware of the situation. Further, he was aware that if JJK liquidated while the price of Alside, Inc., stock was below $11 a share, then he and Janet Kaufman, as preferred stockholders, would receive the entire assets of JJK. However, by recapitalizing in April 1964, when the price of Alside, Inc., stock was $18.625 a share and converting preferred stock into common stock, the appreciated value of Alside, Inc., stock would be attributed to the common stockholders (children of Jerome J. and Janet Kaufman) and thereafter, even if the price of Alside, Inc., dropped (which it did), the children would receive over 50 percent of Alside, Inc., shares from JJK upon liquidation, instead of no shares.

Thus, says the Commissioner, in view of JJK's liquidation and the provisions of the Revenue Act of 1964 it is obvious that no business purpose was served by the recapitalization, which was only a step in an overall plan to liquidate JJK to take advantage of the favorable provisions of the Act and to lessen the tax burden on Jerome and Janet Kaufman at that time. This being so, it is apparent that at the time of the recapitalization the directors of JJK did not contemplate the continuation of the enterprise in the modified form beyond the cutoff date set in section 333(g) of January 1, 1967.

We are faced in this case with a fully stipulated record. This, together with several pieces of documentary evidence, constitutes the sum total of evidence herein.

Obviously such a record limits our ability to inquire and limits our consideration to the facts so presented and permits us only to make such inferences as appear reasonably justified. *Conservative Gas Co.*, 30 B.T.A. 552, 555 (1934).

In light of this restriction and the record facts we cannot sustain the Commissioner herein. His argument appears to be based on inferences alone which we believe are not warranted by the record. His attempt to disprove the business purpose maintained by petitioners, i.e., that the recapitalization was undertaken to relieve the corporation of a large dividend arrearage and to produce a significant shift in economic interests apart from the tax result flowing therefrom, is wholly based on the inferences he draws and not on record evidence. The Commissioner would have us link the Revenue Act of 1964 (enacted February 26, 1964), the recapitalization (April 1964), and the liquidation (November 1965), approximately 19 months later, in a continuous unbroken chain to strike down by hindsight what has before been recognized as a legitimate business purpose, i.e., elimination of a dividend arrearage. See *Daisy Seide*, 18 T.C. 502, 511 (1952), where we said:

Nor are the reorganization provisions inapplicable by reason of the absence of a "business purpose." One of the reasons for the elimination of the preferred stock was to wipe out the accumulated "deficit" in unpaid dividends, * * *. This was a valid business or corporate purpose (cf. *Okonite Co.* v. *Commissioner* (C.A. 3), 155 F. 2d 248, 250, certiorari denied 329 U.S. 764; *Thermoid Co.* v. *Commissioner* (C.A. 3), 155 F. 2d 589, 590; *Morainville* v. *Commissioner* (C.A. 6), 135 F. 2d 201; *Skenandoa Rayon Corp.* v. *Commissioner* (C.A. 2), 122 F. 2d 268, certiorari denied 314 U.S. 696; *H. Grady Manning Trust*, 15 T.C. 930, 942), and the reorganization provisions, which otherwise literally cover this controversy, cannot therefore be rendered inapplicable.

The Commissioner does not argue that this transaction was a shield for a distribution of dividends or for some other improper purpose. On the record he cannot, for the record discloses nothing other than a recapitalization unless the hindsight afforded by liquidation 19 months afterwards affords him that privilege. On the stipulated facts we believe petitioners have shown a valid business purpose. In order for the Commissioner to cast this aside, it was incumbent on him to show that although this was in form a recapitalization, it nevertheless occurred in such a setting as to strip it of its otherwise tax-free nature. See *George W. Van Vorst, Executor*, 22 B.T.A. 632 (1931), affd. 59 F. 2d 677 (C.A. 9, 1932). We are of the opinion that the Commissioner has failed to do this, basing, as he has, his case on inferences which we feel are not reasonably justified. The Commissioner time and again asks us to infer that petitioners knew this fact, were aware of that fact and that somehow petitioners knew that the price of Alside would decline to a point where liquidation of JJK would cause the senior Kaufmans to receive all of the proceeds of liquidation unless there was some shift in the ownership interests. Thus, with this

in mind, JJK was recapitalized.[6] Yet this overlooks the equally valid opposite inference that the price of Alside would rise, a realistic possibility since Alside stock was traded publicly on the New York Stock Exchange.

Finally, the Commissioner's entire argument is based on the Revenue Act of 1964. From the Act he ascribes motives to the petitioners without presentation of even an iota of evidence. To accept his position, on the record herein, would throw a cloud over the ability of taxpayers to avail themselves of relief measures enacted by Congress. The Commissioner's contention places the events preceding the liquidation in such a light as to make them merely a prelude to the relief intended and thereby strips them of their independent significance for purposes of taxation. To view events in this fashion, we think, would restrict the courses of action available to those who would benefit from such provisions. We are therefore unwilling, on a record as appears before us now, to rely solely on inference to reach our decision.

*Decisions will be entered under Rule 50.*

---

[6] We must point out that by virtue of the recapitalization the preferred shareholders surrendered certain rights, priorities, and preferences which existed until that time. Among them were accrued unpaid dividend arrearages of $23.79 per share; a liquidation preference of $123.79 per share (including the aforementioned dividend arrearage); the right to payment of cumulative preferred dividends at the rate of $5.95 per share, after a payment of a $0.05 per share dividend on each share of both preferred and common, but before any other payment with respect to the common; and the right to one vote for each share of preferred surrendered in exchange for one vote for each share of common received or an approximate reduction of 97.4 percent in the number of votes attributable to each preferred shareholder's investment.

We think that the relinquishment of the above rights, priorities, and preferences, and the acceptance of a junior position by petitioners, sufficiently satisfied the description of a recapitalization as a "reshuffling of a capital structure, within the framework of an existing corporation" as stated by the Supreme Court in *Helvering* v. *Southwest Corp.*, 315 U.S. 194, 202 (1942).