*Decision will be entered under Rule 155.*

FERNIE C. LAUGHINGHOUSE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARGARETTE S. LAUGHINGHOUSE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6975–80, 6976–80.    February 15, 1983.

---

*William P. Pinna*, for the petitioners.
*Frank C. McClanahan III*, for the respondent.

OPINION

FEATHERSTON, *Judge*: Respondent determined deficiencies in petitioners' gift tax liabilities as follows:

| Docket No. | Petitioner | Quarter ended Dec. 31— | Amount |
|---|---|---|---|
| 6975–80 | Fernie C. Laughinghouse | 1976 | $80,825.80 |
| | | 1977 | 12,194.52 |
| 6976–80 | Margarette S. Laughinghouse | 1976 | 86,920.17 |
| | | 1977 | 12,956.31 |

After concessions, the sole issue for decision is the value of partnership interests transferred by petitioner Margarette S. Laughinghouse in the quarter ended December 31, 1976. That issue depends on whether the value of real estate that she transferred to a partnership, subject to outstanding mortgages, should be reduced by the amount of certain notes, secured by one of those mortgages, which were bequeathed to her by her father but not distributed to her until 1977.

This case was submitted fully stipulated, and the facts as stipulated are as found. At the time they filed their petitions in these consolidated cases, petitioners Fernie C. Laughinghouse (Fernie) and Margarette S. Laughinghouse (Margarette), husband and wife, were legal residents of Pantego, N.C. Margarette is the only child of Allen D. Swindell (Allen), deceased, and Lizzie H. Swindell (Lizzie).

By deeds dated July 14, 1975, Allen and Lizzie transferred 3,125.16 acres of land located near Pantego, N.C., to Margarette (the Pantego land). Of this land, 2,218.36 acres were held in fee by Allen, and the remaining 906.8 acres were held by Allen and Lizzie as tenants by the entirety. The consideration for this transfer was $938,413.09 consisting of cash in the amount of $262,755.69 plus 40 secured purchase-money notes. Twenty of the notes were payable to Allen, and each of these notes was in the face amount of $27,026.30 for a total of $540,526. The remaining 20 notes were payable to Lizzie in the total amount of $135,131.40.

All of the notes bore interest at 5 percent, and had maturity dates such that one note to Allen and one note to Lizzie were payable, along with accrued interest on the other outstanding

notes, on October 1 of each year, beginning on October 1, 1976. Payment of the last notes was to become due October 1, 1995.

To finance part of the payment for this land, Margarette borrowed $326,000 from the Federal Land Bank (the bank), and the loan was secured by a first deed of trust on the Pantego land (the first mortgage). Margarette also executed a second deed of trust to Allen and Lizzie securing the two series of notes in the total amount of $675,657.40. This second deed of trust covered the Pantego land but was subordinated to the bank's first mortgage. Both deeds of trust were recorded on September 23, 1975.

Allen died on February 12, 1976, and in his will, dated December 9, 1975, he named Margarette as executrix. Article II of the will specifically bequeathed to Margarette "all promissory notes owed to me at my death that my daughter is the maker thereof." The residue of the estate was bequeathed to two trusts, a marital trust and a nonmarital trust. Margarette, Fernie, and their son, Durwood S. Laughinghouse (Durwood), were appointed co-trustees of the trusts.

Margarette was appointed executrix of Allen's estate, and Allen's will was admitted to probate.[1] No distributions of assets subject to administration were made by the executrix in 1976.

On December 17, 1976, Margarette, along with Fernie and their two children, Durwood and Dianne Laughinghouse Bowen (Dianne), formed Diwood Farms partnership (Diwood). Diwood's initial capital was $1,000, and interests in it initially stood at 26 percent for Margarette and Fernie and 24 percent for Durwood and Dianne. On December 28, 1976, Margarette transferred 2,966 acres[2] of the 3,125.16 acres of the Pantego land to Diwood "subject to" the first deed of trust which secured the note to the bank and the second deed of trust which secured the notes to Allen and Lizzie. Because the partners' capital accounts reflected capital contributions, after this transfer, Margarette's capital account stood at approximately 100 percent. To adjust the partnership capital ac-

---

[1]The terms "executrix" and "personal representative" are used interchangeably herein. Also, the term "mortgage" is used interchangeably with the term "deed of trust."

[2]The deed evidencing this transfer states that 2,773.592 acres were transferred, but a recent survey revealed, and the parties agree, that 2,966 acres were actually transferred.

counts, Margarette then transferred 24-percent interests in the partnership capital to each of her children, Dianne and Durwood, and a 3-percent interest in the partnership capital to her husband, Fernie. Following these transfers, Margarette's capital account stood at 49 percent, Durwood's and Dianne's at 24 percent each, and Fernie's at 3 percent.[3]

Margarette and Fernie filed timely Federal gift tax returns for the calendar quarter ended December 31, 1976, on which the transfers of the Diwood interests were reported, except that the value of the interest transferred to Fernie was erroneously omitted. Margarette and Fernie elected to treat the gifts to Dianne and Durwood as split gifts, pursuant to section 2513.[4]

In December 1977, Margarette transferred to each of her children, Dianne and Durwood, a 5-percent interest in Diwood, thus increasing their respective shares of the partnership to 29 percent each, and reducing Margarette's share of the partnership to 39 percent. In computing the value of the gifts transferred in December 1977, petitioners reduced the value of the partnership interests transferred by an amount representing the liability of the notes to Allen, all of which had been distributed or paid by December 1977. The parties have now agreed that the deficiency in gift tax for the quarter ended December 31, 1977, should be computed without regard to such notes.[5]

In satisfaction of the specific bequest as provided by article II of Allen's will, on February 9, 1977, Margarette, as executrix of Allen's estate, distributed 19 of the 20 purchase-money notes owned by Allen's estate to herself as legatee. In the distribution order, she was formally advised that such distribution was subject to any future estate obligations for which the residuary estate was insufficient. On June 29, 1977, Margarette made a payment to Allen's estate in the amount of

---

[3]Because the Pantego land was essentially the only asset in Diwood (except the $1,000 initial capital), the value of a transferred interest in the partnership was nearly equivalent to a gift of a like interest in the land, itself. For simplicity, we shall sometimes refer to the value of the land rather than the partnership interest as being subject to gift tax.

[4]All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

[5]Cf. note 7 *infra*.

$55,066.09. This payment represented the payment in full of the first note to Allen, due October 1, 1976, in the amount of $27,026.30, plus $1,013.49 paid as late interest on the single note and interest also due October 1, 1976, on all 20 notes.

In computing the fair market value for gift tax purposes of the 24-percent interests in Diwood which were transferred to Dianne and Durwood in December 1976, petitioners first calculated a gross value of the partnership's real estate (number of acres owned by Diwood × value per acre). From this figure, petitioners subtracted the face amount of the bank's first mortgage in the amount of $326,000 and the second mortgage of Allen and Lizzie in the amount of $668,900.83. This produced a value of the partnership, which was then multiplied by 24 percent to obtain the alleged fair market value of the gifts to the children.

The parties agree that the method employed by petitioner to compute the fair market value of the gift is a correct method of computation,[6] but respondent contends that part of the liability represented by the second mortgage (i.e., the notes to Allen) should not be allowed as a reduction from the gross value of the partnership real estate in arriving at the value of the gifts.[7]

---

[6]The parties also agree on some adjustments in the fair market values of the mortgages as of Dec. 28, 1976.

[7]The parties agree that the interests subject to gift tax in calendar quarter ended Dec. 31, 1976, are to be valued in one of the following ways:

If the notes to Allen are allowable as liabilities which reduce the value of the real estate (petitioners' position), the gifts are valued as follows:

| | |
|---|---|
| Gross value of real estate: | |
| 2,966 acres × 600 | $1,779,600.00 |
| Less: | |
| First mortgage (Federal Land Bank) | (291,444.00) |
| Second mortgage (notes to Lizzie) | (114,767.10) |
| Second mortgage (notes to Allen) | (507,391.76) |
| Partial value of partnership | 865,997.14 |
| Gift to Dianne (24 percent × $865,997.14) | 207,839.31 |
| Gift to Durwood (24 percent × $865,997.14) | 207,839.31 |
| Gift to Fernie (3 percent × $865,997.14) | 25,979.91 |

If the notes to Allen are not allowable as liabilities which reduce the value of the real estate (respondent's position), the gifts are valued as follows:

| | |
|---|---|
| Gross value of real estate: | |
| 2,966 acres × $600 | $1,779,600.00 |
| Less: | |
| First mortgage (Federal Land Bank) | (291,444.00) |

As the law stood on December 28, 1976, when Margarette transferred the land to Diwood, section 2501(a)(1) imposed a tax on "the transfer of property by gift" during the calendar quarter. According to section 2512, if a gift is made in property, the "value" of the property "at the date of gift" is the amount of the gift. Where property is transferred "subject to" a mortgage, it is necessary as a general rule (and as the parties agree in this case) first to determine the fair market value of the whole property on the date of the gift and then to deduct the amount of the mortgage debt on that date. *Drybrough v. United States*, 208 F. Supp. 279, 283 (W.D. Ky. 1962). The parties agree on the fair market value of the whole property, and respondent concedes that the amount of the Federal Land Bank deed of trust and the amount of Lizzie's deed of trust should be subtracted from the Pantego land's value. The issue to be decided is whether the second mortgage covering the notes to Allen, to which Margarette's transfer to Diwood was made subject, is properly allowable as a reduction in the gross value of the partnership real estate in valuing the gifts made in the calendar quarter ended December 31, 1976. We conclude that this question must be answered affirmatively.

The Supreme Court in *Morgan v. Commissioner*, 309 U.S. 78, 80 (1940), declared: "State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed." We must then turn to State law to see what legal interests and rights were held and transferred by Margarette in the December 1976 land transaction with Diwood. See 5 J. Mertens, Law of Federal Gift and Estate Taxation, sec. 34.13, at 63 (1959).

We begin with the fact that, as we view the record before us, Margarette's notes to Allen were valid obligations enforceable according to their terms and secured by a recorded purchase money deed of trust. Both the notes and the second deed of trust are in the record, and on their face they contain no legal

| | |
|---|---|
| Second mortgage (notes to Lizzie) | ($114,776.10) |
| Partial value of partnership | 1,373,388.90 |
| Gift to Dianne (24 percent × $1,373,388.90) | 329,613.34 |
| Gift to Durwood (24 percent × $1,373,388.90) | 329,613.34 |
| Gift to Fernie (3 percent × $1,373,388.90) | 41,201.67 |

infirmities that we have discovered. They evidence binding, secured obligations. Indeed, the parties have stipulated that the "consideration" for the July 1975 land transfer from Allen and Lizzie to Margarette "was $938,413.09, which consisted of $262,755.69 paid in cash and the balance paid by 40 purchase money notes of Margarette." The parties have further stipulated that the "second deed of trust was in the amount of $675,657.49, and secured the payment of that amount." Given these stipulated facts, we have no ground for concluding that the notes were not bona fide obligations—"that they were without consideration, invalid, unreal, or otherwise than what they purported to be." *Story v. Commissioner*, 38 T.C. 936, 941–942 (1962).

Respondent argues that the whole transaction was "an abusive tax avoidance vehicle" and the notes should be disregarded as lacking bona fides because, he argues, "petitioners have failed to demonstrate either that Margarette ever had any intention to pay the notes, or that Allen ever had any intention to enforce payment." But the stipulations that the notes and deeds of trust, which were in proper legal form, were part of the "consideration" for Allen's transfer of the Pantego land to Margarette and that the notes were "secured" by the second deed of trust, coupled with respondent's implicit acknowledgement that the simultaneously given notes to Lizzie, secured by the same deed of trust, were valid (see note 7 *supra*), negate respondent's argument. The stipulated facts, as a minimum, establish a prima facie case that the parties intended the notes to be paid, and there is no evidence to the contrary.[8] Petitioners do not have the burden of disproving every possible theory respondent may advance. *Van Vorst v. Commissioner*, 22 B.T.A. 632, 634–635 (1931), affd. 59 F.2d 677 (9th Cir. 1932); see *Kaufman v. Commissioner*, 55 T.C. 1046, 1054–1055 (1971).

---

[8]In *Story v. Commissioner*, 38 T.C. 936, 941 (1962); *Haygood v. Commissioner*, 42 T.C. 936, 946–947 (1964); and *Estate of Kelley v. Commissioner*, 63 T.C. 321, 323–324 (1974), this Court held that the payee of a series of notes, valid and enforceable on their face, did not make a gift on completion of the transaction in which he received the notes even though he intended to forgive each note in the series as it became due. Cf. also *Davies v. Commissioner*, 40 T.C. 525, 531 (1963). By not relying on these cases we do not intend to question their correctness. In the instant case, there is no substantial evidence whatever that the parties did not intend that the notes be paid according to their terms.

What, then, was the effect of Allen's death on February 12, 1976, and the provisions in his will that the 20 valid notes signed by Margarette were to pass to her and that she was to be executrix of his will? North Carolina General Statutes section 28A–15–2 (1976)[9] specifically provides that, upon the appointment and qualification of the personal representative of a decedent's estate, all title and right of possession in the decedent's personalty shall be vested in the personal representative for the purpose of administering the decedent's estate. N.C. Gen. Stat. sec. 28A–15–11 (1976) provides further that the appointment of any person as personal representative does not discharge any debt due from such person to the decedent.[10] Until the executor assents to the distribution of the bequest "the legatee has only an inchoate right in the surplus after payment of debts." *In re Brewer*, 289 F. 79, 86 (E.D. N.C. 1923). Thus, until the notes were distributed, Margarette did not own them in her own right and she had only a presumptive entitlement, an expectancy that they would be distributed to her upon settlement of the estate.

Respondent, relying upon the doctrine of merger, argues that petitioner could have distributed the notes to herself prior to the December transfer and that, if she had done so, the notes would have been extinguished by operation of law. To support this position, respondent cites *Waff Bros., Inc. v. Bank*

---

[9]N.C. Gen. Stat. sec. 28A–15–2 (1976) provides as follows:

Sec. 28A–15–2. Title and possession of property.—(a) Personal Property.—Subsequent to the death of the decedent and prior to the appointment and qualification of the personal representative or collector, the title and the right of possession of personal property of the decedent is vested in his heirs; but upon the appointment and qualification of the personal representative or collector, the heirs shall be divested of such title and right of possession which shall be vested in the personal representative or collector relating back to the time of the decedent's death for purposes of administering the estate of the decedent. But, if in the opinion of the personal representative, his possession, custody and control of any item of personal property is not necessary for purposes of administration, such possession, custody and control may be left with or surrendered to the heir or devisee presumptively entitled thereto.

(b) Real Property.—The title to real property of a decedent is vested in his heirs as of the time of his death; but the title to real property of a decedent devised under a valid probated will becomes vested in the devisees and shall relate back to the decedent's death, subject to the provisions of G.S. 31–39.

[10]N.C. Gen. Stat. sec. 28A–15–11 (1976) provides as follows:

Sec. 28A–15–11. Debt from personal representative not discharged by appointment.—The appointment of any person as personal representative does not discharge any debt or demand due from such person to the decedent.

*of N.C., N.A.*, 289 N.C. 198, 221 S.E.2d 273, 278 (1976), where the court quoted from 5 H. Tiffany, Real Property, sec. 1482, at 512 (3d ed. 1939), as follows:

> One who is primarily liable for a debt cannot acquire the debt, that is, a claim against himself, and assert that the debt is still outstanding. The same person cannot be debtor and creditor, and the effect of his acquisition of the debt is to render it no longer existent.

Respondent at least implicitly recognizes, however, that for merger to occur it is necessary that the two interests be held by the same person in the same right. As explained by 5 H Tiffany, *supra* sec. 1479, at 504, in a discussion of the general principles of merger:

> In order that the debt may be regarded as merged, it is necessary that it be held in the same right as the land. For instance, if the debt or land is held by one in his own right while the land or debt is held by him as trustee or executor, no merger will occur. * * * (Fn. refs. omitted.)

To the same effect, see 3 J. Pomeroy, Pomeroy's Equity Jurisprudence, sec. 790, at 151–153 (5th ed. 1940); *Swayze v. Schuyler*, 59 N.J. Eq. 75, 45 A. 347 (1900). Indeed, as noted above, N.C. Gen. Stat. sec. 28A–15–11 (1976), expressly provides that a person's appointment as personal representative does not discharge any debt due from such person to the decedent. Merger, therefore, could occur only when the notes were distributed to Margarette in her individual capacity as legatee, and not while she held them as personal representative. And as we shall discuss, we reject respondent's plea that we regard as done what Margarette allegedly could have done, i.e., distribute the notes to herself prior to the transfer of the land to Diwood.

After Allen's death, but prior to the December transfers, then, Margarette owned the Pantego land upon which there were mortgages to the bank, to Lizzie, and to Allen. Given these interests, we must turn to see what property rights she transferred to the partnership, "to fix on just exactly 'what' was the subject matter of the transfer." 5 J. Mertens, *supra* sec. 36.01, at 342. Significantly, when Margarette transferred the Pantego land to Diwood in December 1976 "subject to" the mortgage, she acquired, or retained, important rights. In 5 H. Tiffany, *supra* sec. 1435, at 364, the effect of a transfer "subject to" a mortgage was explained as follows:

By taking a transfer of the land subject to the mortgage, the transferee concedes that, as between him and the transferor, the debt is to be satisfied out of the land, and that the transferor is not, as being personally liable for the debt, under any obligation to pay it for the purpose of relieving the land in the transferee's hands.

A more complete explanation appears in 4 American Law of Property, sec. 16.127, at 297–298 (A. Casher ed. 1952) (hereinafter Am. Law of Property), as follows:

Sec. 16.127. Transfer "Subject" to the Mortgage. The mortgagor may transfer his interest in the property "subject" to the mortgage. This language goes beyond its apparent meaning that the land in the hands of the transferee can be reached by the mortgagee on default in priority to any right of the former in it. What it means in this connection is that the transferee agrees, as between him and his transferor, that the debt is to be satisfied out of the land. Or, as it is frequently put, the land is the principal and the transferor is only in the position of a surety or one secondarily liable. However, the grantee does not become personally liable, without more, to either the mortgagor or to the mortgagee. Nor does it affect the obligation of the mortgagor to the mortgagee. But the mortgagor has no obligation to the transferee to pay it for the purpose of relieving the land in the hands of the transferee. And, although he may not be able to compel the mortgagee to proceed first against the land before seeking payment from him, he does have a right against the grantee that the land be first exhausted in payment of the debt. Likewise, if the mortgagor pays, he will be entitled to reimbursement out of the land. [Fn. refs. omitted.]

Thus, in substance, Margarette's gift to Diwood was only of her net equity in the property.[11] She retained the right to have the mortgage paid out of the land. And this right did not (necessarily) disappear when the notes were later distributed to her as legatee. It is true that: "An assignment of the interest of the mortgagee to the original mortgagor normally results in merger." 3 R. Powell, Real Property, sec. 459, at 696.29 (1949). But merger often does not occur where there are intervening interests. As explained in Am. Law of Property, sec. 16.130, at 302–303:

---

[11]In *Stonecrest Corp. v. Commissioner*, 24 T.C. 659, 666 (1955), the consequences of a transfer subject to a mortgage were explained as follows:

"Taking property subject to a mortgage means that the buyer pays the seller for the latter's redemption interest, i.e., the difference between the amount of the mortgage debt and the total amount for which the property is being sold, but the buyer does not assume a personal obligation to pay the mortgage debt. The buyer agrees that as between him and the seller, the latter has no obligation to satisfy the mortgage debt, and that the debt is to be satisfied out of the property. Although he is not obligated to, the buyer will ordinarily make the payments on the mortgage debt in order to protect his interest in the property."

As against a non-assuming grantee [Diwood] the mortgagor [Margarette] or other transferor has no personal claim to have him pay off the debt. However, the land in the hands of such a grantee becomes the principal fund for payment and the mortgagor stands in the position of a surety. When the debt comes due the mortgagor may pay it and then be subrogated to the rights of the mortgagee in the mortgage. * * * The mortgagor may then reach the land by using the mortgagee's rights to realize out of it by foreclosure. [Fn. refs. omitted.][12]

The same principle of subrogation would apply where the mortgagor obtains the notes by bequest. See also 5 H. Tiffany, *supra* sec. 1435, at 368; sec. 1506, at 564; sec. 1507, at 565–566.

As explained in 5 H. Tiffany, *supra* sec. 1480, at 506, and sec. 1481, at 509, in determining whether merger occurs:

the intention of the holder of the two interests is the decisive consideration, and * * * no merger will take place if there is proof of an intention on his part to the contrary.

*     *     *     *     *     *     *

It frequently happens that there is no evidence as to the intention in this regard, and in such a case equity will usually presume that the owner of the two interests intended that they should merge, or the contrary, according as merger vel non would be most for his benefit. [Fn. refs. omitted.]

Indeed, "Equity * * * has never favored the rule of merger, and, if there is any advantage to be gained by continuing the independent existence of the [mortgage] rights, that continuance, explained as a product of 'intent,' actual or presumed, is maintained in equity." 3 R. Powell, *supra* sec. 459, at 696.25. See also Am. Law of Property, sec. 16.143, at 336–337. In short, the "mortgagor is not handicapped by merger on acquiring the mortgage where intervening liens are present." 3 R. Powell, *supra*, sec. 459, at 696.30. See *Waff Bros., Inc. v. Bank of N.C., N.A.*, 289 N.C. 198, 221 S.E.2d 273, 279 (1976).[13]

Respondent emphasizes and reiterates, however, that Margarette, as executrix, "could have" distributed the notes to

---

[12]The author of this quotation recognizes some technical problems for the mortgagor in asserting the mortgagee's rights in these circumstances but lists several solutions to them.

[13]Thus, when Margarette acquired the notes as legatee in February 1977, the presumption is that no merger occurred, as this would have been to her detriment by eliminating her rights against Diwood and according Diwood a windfall benefit of release from the mortgage debt. Cf. Am. Law of Property, sec. 16.144, at 341–342. Rather, in the absence of evidence to the contrary, we assume that she kept alive her rights under the mortgage against Diwood. If she failed to collect from Diwood on the mortgage, she may have made a gift in a later calendar quarter, but, if so, the facts relating to such a transaction are not before the Court.

herself, as an individual, before she transferred the Pantego land to Diwood with the result that she would have been both debtor and creditor and the principle of merger would have caused the debt to disappear.[14] Respondent appears to argue that Margarette's tax liabilities should be determined as if she had done so.

The argument lacks merit. Margarette, in fact, did not distribute the notes to herself before she transferred the Pantego land, and her tax liability is to be determined by what she did, not what she could have done: "a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred." *Frank Lyon Co. v. United States*, 435 U.S. 561, 577 (1978); *Central Tablet Manufacturing Co. v. United States*, 417 U.S. 673, 690 (1974); *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148–149 (1974). Parties have the right to choose particular structures for their transactions and where those transactions serve purposes other than tax avoidance, courts are loath to disturb them. See *Frank Lyon Co. v. United States*, *supra* at 584–585. In this case, Margarette's transfer of the Pantego land subject to the outstanding mortgages created legal rights and obligations different from those that would have been created under respondent's scenario. Without more evidence supporting respondent's assertions, we cannot ignore the legal effects of the transaction as it was structured.

Indeed, respondent's hypothesis lacks a factual base. There is no evidence to show that Margarette "could have" distributed the notes to herself in December 1976 without violating her trust as executrix. The trial record contains no information on the financial condition of Allen's estate—whether it was large or small; whether the notes were the only assets in the estate; whether he owed debts and, if so, how much he owed; whether there were unliquidated claims against him which had to be

---

[14]We reject in these circumstances a perhaps implied notion of "instant merger." Cf. *Estate of Thiele v. Commissioner*, 9 T.C. 473 (1947). It has been held that, on receipt of title to two estates by reason of devise or bequest, the new owner has a reasonable time in which to form an intention regarding merger, depending on his own best interests. *Delaware Nat. Bank of Delhi, N.Y. v. Wiss*, 284 N.Y.S. 615, 620–621, 158 Misc. 276 (1936). If, as respondent urges, we are to treat Margarette's receipt of the notes as an accomplished fact by the time of the December 1976 transfer, the fact that Margarette made a subsequent transfer of the property *subject to* the mortgage evidences an intention against merger. Am. Law of Property, sec. 16.143, at 338; 5 H. Tiffany, Real Property, sec. 1481, at 508–509 (3d ed. 1939).

resolved and, if so, their magnitude. Without evidence on such matters in the record, the assertion that Margarette, as executrix, could have distributed the notes earlier than she did is pure conjecture.[15]

There is, moreover, no evidence of an inordinate delay in the distribution of the notes and the completion of the administration of the estate. Allen died February 12, 1976. The date Margarette qualified as executrix is not shown, but North Carolina law directed her to notify creditors within 20 days of her appointment so that they could present their claims within the next 6 months. N.C. Gen. Stat. sec. 28A–14–1 (1976). Barring extensions, the general rule called for a final accounting to be filed within 1 year of her qualification or within 6 months of her receipt of the State inheritance tax release, whichever was later. N.C. Gen. Stat. 28A–21–2(a) (1976), as then in effect. Margarette made the disputed transfer on December 28, 1976, approximately 10 months after Allen's death.[16]

We conclude that Margarette's gift in the fourth quarter of 1976 to Diwood should be valued by subtracting the amount of the notes payable to Allen and secured by the second deed of trust.

To reflect the disposition of other issues,

*Decisions will be entered under Rule 155.*

---

[15]Respondent argues that petitioners bear the burden of showing that Margarette had a valid reason for not distributing the notes before the December transfer. He asserts that petitioners ask the Court to "assume" an "innocent" purpose for this "delay." Respondent is incorrect. Petitioners have built a prima facie case, based on the facts as they occurred, which show that the notes were valid, enforceable obligations as of Dec. 28, 1976. To place upon petitioners the burden of disproving all of respondent's hypotheses, presented only on brief, would, we think, greatly expand their burden of proof. See *Van Vorst v. Commissioner*, 22 B.T.A. 632, 634–635 (1931), affd. 59 F.2d 677 (4th Cir. 1932); cf. *Kaufman v. Commissioner*, 55 T.C. 1046, 1054–1055 (1971).

[16]Except as provided in N.C. Gen. Stat. sec. 28A–21–2(a) (1976), if all debts were paid, or satisfied, the personal representative was permitted to file his final account after 6 months from the publication of notice to creditors. N.C. Gen. Stat. sec. 28A–21–2(b) (1976).